DIRECTOR OF FINANCE FOR THE CITY OF
BALTIMORE ET AL. *v.* ALFORD

[No. 73, September Term, 1973.]

*Decided November 28, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Howard E. Wallin, Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor,* and *Ambrose T. Hartman, Deputy City Solicitor,* on the brief, for appellants.

*Paul D. Bekman* and *William H. Engelman,* with whom were *Kaplan, Heyman, Engelman & Belgrad* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Fearing civil disorders of one kind or another the Police Commissioner of Baltimore City, a day or two prior to 3 April 1969 (the first anniversary of the assassination of Dr. Martin Luther King), issued a memorandum placing the entire department on a five-day "10-10 Alert," beginning at 12:01 a.m. on 3 April. During this period policemen, whether on leave or simply "off duty," were required "to keep themselves available" to be called back "on emergency status." In the early evening of 3 April a number of men, including the appellee (Alford), were notified by telephone to report for duty as soon as possible.

Alford, a 15-year veteran, lived, at the time, with his mother in the Belair Road-Sinclair Lane area of the city. Between 7:00 and 7:30 p.m. on 3 April he put on his uniform and went to the house of his sister-in-law near Harundale in Anne Arundel County where, aware of the "10-10 Alert," he told his mother he could be reached until it was time for him to leave for the Northeastern District Station. He was scheduled to report there for duty on the 11:30 p.m. to 7:00

a.m. shift. "Sometime" after 9:00 p.m. he was notified by telephone to come in as soon as possible. Of the two routes available to him he chose the one that would take him through the Harbor Tunnel instead of the one that would take him over the Hanover Street bridge. At or about this time a tractor-trailer had capsized in the Harbor Tunnel. Alford was caught in the ensuing traffic jam. By about 10:40 p.m. he had reached the toll booths at the south end of the tunnel. While "at a complete standstill" his car was struck in the rear and driven into the car ahead of him. He was taken to South Baltimore General Hospital. Since the accident, as a result of the injuries he sustained, he has been assigned to light clerical work.

In May 1970 he applied to the Board of Trustees of the Fire and Police Employees' Retirement System of the City of Baltimore (Board) for special disability retirement.[1] The hearing begun 11 March 1971 was not concluded because the Board thought it advisable to obtain guidance from the City Solicitor, who is also the Board's "legal advisor." The hearing was resumed on 29 July 1971 by which time the Board had been advised by the City Solicitor that Alford ought not to be given special disability retirement benefits because his injuries did not arise "out of and in the course of the actual performance of duty." The Board (5 members present) chose to disregard the counsel of its "legal advisor" and by a vote of 3 to 2 it decided in favor of Alford. The Board (7 members present), at the request of the City Solicitor, reconsidered its decision and, on 16 December 1971, by a vote of 4 to 3, held fast to its earlier decision. On 22 December the City Solicitor advised the appellant Benton that the Board's decision had "no basis in law and that any payment made pursuant to it would accordingly be unlawful." In effect Benton was directed not to pay.

1. *"Special disability benefit.* Upon the application of a member or the head of his department, any member who has been totally and permanently incapacitated for duty as the result of an injury arising out of and in the course of the actual performance of duty, without wilful negligence on his part, shall be retired by the Board of Trustees, provided that the medical board shall certify that such member is physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such member should be retired." Baltimore City Code (1966), Art. 22, § 34 (e).

In January 1972 Alford sought the issuance of the writ of mandamus to compel Benton to pay over the amounts awarded to him by the Board. Benton resisted. The case came on to be heard before Grady, J., in October 1972. In January 1973 Judge Grady ordered the issuance of the writ. In the opinion filed with the order he said:

> "[I find] that Benton ha[d] an absolute duty to perform the ministerial function of paying the benefits awarded to Alford. On this ground alone . . . [Alford] is entitled to the relief he seeks."

We see it somewhat differently. In *Thomas v. Owens*, 4 Md. 189 (1853), the Treasurer of the State refused to honor a warrant issued by the Comptroller for the sum of $1,111.11, which sum he (the Comptroller) claimed to be due him as salary for a certain period. Chief Judge Le Grand, speaking for the Court, said:

> "When there is an appropriation, and a proper warrant drawn by the Comptroller and presented to the Treasurer, his duty is purely *ministerial:* all he has to do in such a case, is to count out the money; an act ministerial, and nothing else." *Id.* at 230.

But Judge Le Grand went on to say:

> " . . . [W]e are of opinion, that the Treasurer properly refused to pay *this* warrant, because it did not show on its face the particular law under which it was drawn. It professes to have been issued under the constitution and an act of Assembly, without designating what particular act. For these reasons, and because the Comptroller in his petition claimed more than he was entitled to, we affirm the order of the circuit court refusing the *mandamus.*" *Id.* at 231.

It seems to us that Benton found himself in a position much like that of the Treasurer in 1853. He had before him the letter of the chief legal officer of Baltimore City

tantamount, in the circumstances, to an order. Only at his peril could he close his eyes to it. He surely had the right, perhaps even the duty, to refuse payment and thereafter to cooperate with the City Solicitor in resisting Alford's action, thereby provoking an investigation of the legality of the action of the Board. *E.g., California Highway Comm'n v. Riley,* 218 P. 579 (Calif. 1923); *Weiner v. City of Boston,* 172 N.E.2d 96 (Mass. 1961); *State v. Martin,* 64 Wash. 2d 511, 392 P. 2d 435 (1964); *State v. Hastings,* 10 Wis. 525 (1860). It must not be supposed, however, that our holding in this regard goes any further than the resolution of the case before us or any future case having virtually identical facts and circumstances.

We shall affirm the result reached by Judge Grady but for a reason he seems not to have considered. Alford argued both here and below that he comes within the special mission exception to the going and coming rule. Benton relies exclusively upon the going and coming rule.

The basic issue, of course, is whether Alford's incapacity is the result of an injury which arose "out of and in the course of the actual performance of duty." Well established, in respect of the application of Workmen's Compensation acts, is the general rule that if an employee is injured while going to work or returning therefrom his injury cannot be said to have arisen out of or in the course of his employment. The cases so holding can, by analogy, be used in the appraisal of claims made under § 34 (e) and the parallel § 6 (e).[2] *Salomon v. Springfield Hospital,* 250 Md. 150, 242 A. 2d 126 (1968); *Pariser Bakery v. Koontz,* 239 Md. 586, 212 A. 2d 324 (1965); *Police Comm'r v. King,* 219 Md. 127, 148 A. 2d 562

---

**2.** *"Accidental disability benefit.* Upon application of a member, or of the head of his department, any member who has been totally and permanently incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place, without wilful negligence on his part, shall be retired by the Board of Trustees provided that the medical board shall certify that such member is mentally or physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such member should be retired." Baltimore City Code (1966), Art. 22, § 6 (e).

(1959); *Rumple v. Henry H. Meyer Co.*, 208 Md. 350, 118 A. 2d 486 (1955); *Heaps v. Cobb*, 185 Md. 372, 45 A. 2d 73 (1945).

It seems odd that this case should come hard on the heels of the "trilogy" written, for the Court, by Judge Singley a month or two ago: *Board of Trustees of the Employees' Retirement System of the City of Baltimore v. Grandinetti*, 269 Md. 733, 309 A. 2d 764 (1973); *Baker v. Board of Trustees of the Employees' Retirement System of the City of Baltimore*, 269 Md. 740, 309 A.2d 768 (1973); *Board of Trustees of the Fire and Police Employees' Retirement System of the City of Baltimore v. Rollins*, 269 Md. 722, 309 A.2d 758 (1973). In *Rollins* Judge Singley discussed the ordinance applicable here, Art. 22, § 34 (e), *supra.* In *Grandinetti* and *Baker* he discussed § 6 (e), *supra*, which, it will be observed, is for all practical purposes a carbon copy of § 34 (e). In *Rollins* Judge Singley made liberal use of what we said in *Adams v. Board of Trustees*, 215 Md. 188, 137 A. 2d 151 (1957), where § 6 (e) was the controlling ordinance.[3]

An early recognition of the special mission exception will be found in *Reisinger-Siehler Co. v. Perry*, 165 Md. 191, 167 A. 51 (1933). There Perry had been employed to look after his employer's store from 6:00 a.m. to 6:00 p.m. In addition he was subject to call at any time. Upon returning home from a social call one night in June 1932 he learned that a policeman had called at his house and that he had left a

---

3. In *Adams* the Court stated:

"Of course, if the action the Board took had been supported by the evidence, or if there had been any disputed facts before it, its decision would not be open to judicial reversal. *Heaps v. Cobb* [185 Md. 372, 45 A. 2d 73 (1945)], at p. 385. But there was no *real* dispute as to any of the essential facts. In fact the evidence unmistakably supports the claim of the petitioner for an accidental disability retirement as prescribed by the ordinance. Thus, there was no basis for the exercise of judgment or discretion. *Heaps v. Cobb, supra*, at p. 386. Yet, the Board decided, by a majority vote, without assigning any reason therefor, to disapprove accidental disability retirement. In so doing we think it is clear that the Board was arbitrary in arriving at the conclusion it did because its action was not supported by the evidence. *Heaps v. Cobb, supra*, at p. 380. Instead, the Board had the mandatory duty of approving the application of the petitioner for accidental disability retirement." 215 Md. at 195-96, 137 A. 2d at 155. (Emphasis in original.)

message about the store. He went immediately to the store and found the lights on and the back door open. After investigating he turned out the lights, locked the doors and started for home. On the way he was struck by an automobile. The Commission [4] awarded Perry compensation. The trial court affirmed the award. Our predecessors affirmed the decision of the trial court. Judge Pattison, after reviewing the cases, said, for the majority of the Court (Bond, C. J., and Parke, J., dissenting):

"The claimant in this case was employed regularly at his employer's store from 6 o'clock in the morning until 6 o'clock in the evening, to care for the building, as stated in the evidence. When his day's work was over, he was, of course, permitted to return to his home, but he was thereafter subject to call at any time to go to the store to care for any unusual conditions that might be found to exist there. It may be said that he had no time which he could absolutely call his own, for when he was wanted he was expected to be in a position where he could be reached and ready to go in the performance of his duty.

"The record does not disclose any express agreement between him and his employer relative to the duties that he was to perform, or the remuneration he was to receive. Under his regular employment, his duties were to remain at the store during the day; but, in addition to this, he was, as we have said, when at home, subject to further duties when called upon. The times when these duties were to be performed were uncertain, as he was to go to the store only when unusual conditions existed there. What he was to do and the length of time he was to remain there were equally uncertain. It was possible that when called from his home and possibly from his bed, at night, the work

---

4. The State Industrial Accident Commission, now the Workmen's Compensation Commission.

he found necessary to be done upon reaching the store would require his presence for but a few minutes, and it could hardly be said that this employment, for which he was to be remunerated, would cover only the period for which he was actually at work in or about the store. The work that he was called upon to do under these circumstances differs greatly from the regular employment of one employed at regular hours at a given place, and who at the expiration of the period of his work is free to serve himself as he pleases.

"There was, we think, an implied agreement, from the nature and character of the employment of the claimant in the performance of the additional duties, that his employment was not to be restricted to the time in which he was at work at the store on such occasions. It was in the nature of an *errand or mission* on behalf of his employer, and when so treated his employment commenced at the time when he left his home to go to the store, and ended when he returned to his home." *Id.* at 198-99. (Emphasis added.)

*Reisinger-Siehler* was noticed with approval in *Maryland Paper Products Co. v. Judson,* 215 Md. 577, 585, 139 A. 2d 219 (1958). Chief Judge Brune, for the Court, said:

"Some fairly well defined exceptions to or modifications of the 'going and coming' rule have developed, as in . . . *Reisinger-Siehler Co. v. Perry,* 165 Md. 191, 167 A. 51, where an employee on call after regular hours was injured while on his way home after performing an extra, after-hours duty. See also *Gallman v. Springs Mills,* 201 S. C. 257, 22 S.E.2d 715; *Schneider, Workmen's Compensation* (1951), Vol. 8, Sec. 1710."

The courts of other jurisdictions seem to have reached like conclusions. In *Lewis Wood Preserving Co. v. Jones,* 110 Ga. App. 689, 695, 140 S.E.2d 113, 117 (1964), the court, citing *Reisinger-Siehler,* said:

"In the instant case it is apparent that, immediately upon receiving the employer's telephone call, *it became the employee's duty to go directly to his place of employment as rapidly as reasonably possible,* putting aside any private affairs which would be inconsistent with a direct and immediate response to the call. *Failure to do so would presumably have been proper occasion for his discharge.* Although the employee was not paid directly for the time during which he was subject to call, he was nevertheless required to be available for call . . . ." (Emphasis added.)

*Accord, Jonas v. Lillyblad,* 137 N.W.2d 370 (Minn. 1965); *Cavness v. Industrial Commission,* 74 Ariz. 27, 243 P. 2d 459 (1952); *Garvin County v. Pierce,* 406 P. 2d 460 (Okl. 1965); *Thurston Chemical Co. v. Casteel,* 285 P. 2d 403 (Okl. 1955).

Appellants make much of *Hester v. Flowers,* 18 Ohio App. 2d 112, 247 N.E.2d 319 (1969), and *Ross v. Marberry & Co.,* 349 P. 2d 123 (N.M. 1960), both of which support the notion that the employee, who is asked to come in early and who is injured on the way, cannot claim the benefit of the special mission exception to the going and coming rule. We think there are distinguishing factors in those cases which make them inapposite here. In *Hester* there was no emergency to be dealt with. In *Ross* the employee came in early but he was compensated by being allowed to leave early. Alford would have been required to work the full shift despite an early arrival. Appellants attribute great significance to the fact that Alford's overtime pay could not begin until he reported for duty. We see little if any significance in the fact that pay time had not started when he was injured. *Rumple v. Henry H. Meyer Co.,* 208 Md. 350, 118 A. 2d 486 (1955); *Lewis Wood Preserving Co. v. Jones, supra;* 1 Larson, *Workmen's Compensation Law,* § 16 at 4-83 (1964).

Unlike *Baker, supra,* there is no disagreement here in respect of the facts. We must assume therefore that the Board could not have reached the result it did reach unless it thought the special mission exception was the proper rule of

law to be applied. That it did not say why it decided as it did does not make us any less "nettled" than we were by a like default in *Baker*. Since nothing would be gained, however, by remanding the case to the Board simply to have it say what we think it should have said we shall settle the matter by holding that the special mission exception has indeed been the law of Maryland since *Reisinger-Siehler*. Future cases quite likely will present a variety of factual situations which will make difficult the determination of the precise time the employee actually had embarked upon the special mission. Obviously they will have to be dealt with on a case by case basis. Here there is no doubt Alford was well on his way in his automobile; that there was an emergency is clear; he was obliged to obey the order to report as soon as possible; had he failed to do so he could have been disciplined.

> *Order affirmed.*
> *Costs to be paid by the appellants.*