18 A.3d 932

### Michael S. BARCLAY, et al.

v.

### PORTS AMERICA BALTIMORE, INC.

No. 2501, Sept. Term, 2009.

Court of Special Appeals of Maryland.

April 29, 2011.

Henry L. Belsky (Victor D. Sobtka, Lindsay Cooper, Schlachman, Belsky, & Weiner PA, and Gregory Hammond, on the brief) Baltimore, MD, for appellant.

JoAnne Zawitoski (Alexander M. Giles, Teresa M. Kelly, Semmes, Bowen, Semmes, on the brief) Baltimore, MD, for appellee.

Panel: MEREDITH, MATRICCIANI, RONALD B. RUBIN (Specially Assigned), JJ.

MATRICCIANI, J.

On January 24, 2008, Michael S. Barclay, individually and jointly with his wife Robin Barclay, filed a complaint in the Circuit Court for Carroll County. The complaint named as defendants Lena Briscoe, personal representative of the estate of Christopher E. Richardson, Ports America Baltimore, Inc. ("Ports"),[1] the Steamship Trade Association of Baltimore, Inc. (the "STA"), and the International Longshoremen's Association and the Local No. 333 International Longshoremen's Association (collectively, the "ILA").

On April 9, 2008, Briscoe filed cross-claims against Ports, the STA, and the ILA.

On August 1, 2008, Barclay voluntarily dismissed the ILA as a defendant on his direct claims.

On January 30, 2009, STA moved for summary judgment as to Barclay's direct claims and Briscoe's cross-claims, and on February 2, 2009, Ports moved for the same relief.

The court granted both the STA's and Ports' motions on November 10, 2009. The court then stayed proceedings between Barclay and Briscoe and entered final judgments in favor of the STA and Ports on December 22, 2009, which appellants timely appealed. On May 28 and June 7, 2010, appellants voluntarily dismissed their respective appeals of the judgments in favor of STA, leaving Ports as the sole appellee.

### QUESTIONS PRESENTED

Appellants present three questions for our consideration, which we have consolidated and edited for clarity:

I. Did the trial court err when it granted summary judgment in favor of Ports?

For the reasons set forth below, we answer no and affirm the judgment of the Circuit Court for Carroll County.

---

1. At the time of the complaint and at various times throughout the proceedings, Ports was doing business as "P & O Ports Baltimore, Inc."

## BACKGROUND

### Factual History

Christopher Richardson was a stevedore, who worked loading and unloading ships arriving in Baltimore. Ports manages and operates marine cargo facilities in Baltimore.

On January 13, 2006, the captain of the ship "Saudi Tabuk" notified Ports that it was delayed and would arrive later than scheduled, during the night. Ports determined what labor it required to unload the Tabuk, and Ports' labor coordinator issued a "work order" to the STA to dispatch longshoremen.

The STA used a computer program to assign longshoremen according to seniority, based upon information provided by the ILA. Richardson was initially offered a shift beginning on January 15, 2006, which he declined, and instead he accepted an offer to start at 8 a.m. on the Martin Luther King, Jr. holiday, January 16, 2006.

Richardson's terms of employment were governed by a collective bargaining agreement ("CBA") between the ILA and maritime employers, including Ports. A basic agreement was made at the national level, and regional groups worked with employers to supplement the national agreement with local agreements.

Under the relevant CBA, a longshoreman who accepted an offer to work could stay on for as many consecutive shifts as he desired, or he could "check up" and go home, at which point the ILA would send the next most senior qualified longshoreman to take over his work. Shift lengths varied according to the time of day they would begin, and the CBA provided for a one-hour meal break every six hours. According to the CBA, no employees could demand to work through a meal hour.

The CBA had previously imposed a limit of sixteen hours on the working day, but neither the national nor local version of the CBA in place at the time of these facts included any limit on the working day. Representatives of Ports maintained that this change occurred at the insistence of the ILA, whose

members did not want their workday to be limited because it would interfere with seniority rights. Ports' representatives further maintained that for the same reason, Ports could not interfere with the individual's right to work as few or as many consecutive shifts as he or she desired. Ports' representatives also testified that workers regularly "check up" and go home during or at the end of a shift before exhausting all the work they could perform under an offer from the STA.

One of Richardson's fellow longshoreman, Rikar McKenzie testified that, contrary to Ports' position, laborers were pressured to work long shifts. He testified that he was "always" asked to work more than sixteen hours, and that he would face action or poor evaluations if he should "check up" when no replacement longshoreman was available to take over for him.[2]

Under the CBA, hourly wages did not necessarily increase with the duration of a worker's time on the job. Overtime pay would go into effect at 5 p.m. on workdays, but shifts starting as late as 3 p.m. would be entitled to overtime beginning at 5 p.m.[3] Additionally, any workers on the midnight shift who worked past 7 a.m. received extra pay, and all workers received overtime pay for work in excess of forty hours in a given week.

Workers could receive a bonus for "exceptional work," which was awarded at the discretion of their supervisor. Ports maintained that this was not tied to shift duration. The only record evidence of these bonuses is one payroll form dated January 16, 2006, the date of Richardson's last shift. It indicates that out of thirty-one longshoremen on duty that day, twelve received bonuses, and that each of those twelve worked at least seventeen hours. However, eight longshoremen worked at least fourteen hours and did not receive bonuses. Richardson was one of eight workers whose shift

---

2. According to the CBA, the ILA was entitled to prior written notice of any such disciplinary action.

3. Workers were paid at the "regular rate," also known as "straight time" pay, during the hours of 8 a.m. to 12 noon, and between 1 p.m. and 5 p.m.

lasted at least twenty hours; out of those eight, five received bonuses while three did not.

Richardson had reported to work at 8 a.m. on the morning of January 15, 2006. He remained on the job for twenty-two hours, eventually "checking up" at 6 a.m., the following day, January 16, 2006.[4]

At some point, Richardson began his journey home to Carroll county, approximately forty-five miles from where he worked. At approximately 7:30 a.m., Richardson's vehicle crossed the center line of New Windsor Road and collided, head-on, with a vehicle driven by Anne Arundel County Police Sergeant Michael Barclay. Dr. Alan Schwartz, an expert in sleep medicine, opined via affidavit "that Mr. Richardson fell asleep due to fatigue caused by his work as a maritime laborer[.]"[5]

Sergeant Barclay suffered grievous injuries that required over $1.5 million in medical expenses to treat, and his injuries left him unable to work as a police officer. Richardson did not survive the accident.

## Procedural History

Barclay filed a complaint in the Circuit Court for Carroll County on January 24, 2008, naming as defendants Briscoe, as Richardson's personal representative, the ILA, the STA, and Ports. Barclay's complaint alleged that Richardson was negligent in operating his motor vehicle, thereby causing Barclay's injury and damage, as well as loss of consortium as set forth in a separate count. Barclay's complaint further alleged that Ports, the STA, and the ILA "were negligent in that their

---

4. Appellants maintain that Richardson could have worked through his three meal breaks that day, but there appears to be no documentation in the record that would indicate whether or not he did so.

5. Dr. Schwartz's complete statement of his opinion is "that Mr. Richardson fell asleep due to fatigue caused by his work as a maritime laborer for an excessive and unreasonable number of hours." We have omitted the latter part from the body of our opinion because the basis for his characterizations is not set forth in the record or appellate arguments, and our opinion ultimately does not reach this issue.

agent, servant and/or employee, Christopher Eugene Richardson, was operating his vehicle in a careless, reckless negligent manner[.]"

Barclay further alleged that Ports, the STA, and the ILA "breached their duty to the general public not to allow and/or encourage their employees to work in excess of a reasonable number of hours beyond the normal human tolerance." The complaint averred that the three institutional defendants "engaged in a habitual and customary practice of allowing, requiring and/or encouraging their employees to work in excess of a reasonable number of hours for a mature adult human being." Specifically, Barclay alleged that those defendants "were negligent in that they permitted and encouraged the Defendant, [Richardson], Deceased, to work twenty-two hours beginning sometime on January 15, 2006," [6] and that those defendants "knew or should have known that [Richardson], Deceased would have operated his vehicle when leaving the workplace."

Briscoe filed cross-claims against Ports, the STA, and the ILA, claiming that Barclay's injuries and damages were solely caused by their "negligence and want of care."

Barclay voluntarily dismissed the ILA as a defendant on August 1, 2008.[7]

On February 2, 2009, Ports filed a motion for summary judgment on Barclay's direct claims and Briscoe's cross-claims. Ports argued that it was not vicariously liable because Richardson was driving his personal vehicle outside the scope of his employment. Ports further argued that it did not owe the direct duty to the general public alleged in Barclay's complaint.

After a hearing on the matter, the court granted the motion on November 10, 2009. The court explained its ruling in a

---

**6.** The complaint alleged that this was "in excess of fifteen hours as permitted by the collective bargaining agreement between Defendants Ports America."

**7.** The record does not indicate whether Briscoe dismissed her cross-claims against the ILA, but they are not at issue in this appeal.

memorandum opinion determining that Ports is not vicariously liable according to the "going and coming" rule of *respondeat superior*. The court further ruled that because actors in Maryland have "no duty to protect another unless a special relationship ... exists," Ports owed no duty to Barclay as alleged in his complaint.

The court stayed proceedings between Barclay and Briscoe and, pursuant to Maryland Rule 2–602, entered final judgments against them and in favor of Ports on December 22, 2009;[8] appellants then filed timely notices of appeal.

## DISCUSSION

### Standard of Review

Summary judgment is proper where the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law. Md. Rule 2–501(f). We review summary judgment *de novo* and ask whether the trial court was correct as a matter of law. *Chesek v. Jones*, 406 Md. 446, 458, 959 A.2d 795 (2008) (citations omitted). In doing so, we review the factual record independently and view all facts and inferences in a light most favorable to the non-moving party. *David A. Bramble, Inc. v. Thomas*, 396 Md. 443, 453–54, 914 A.2d 136 (2007) (internal citations omitted).

## I.

We first address appellants' argument that the trial court erred when it ruled that Ports was not vicariously liable for Richardson's alleged negligence. Appellants' theory of liability depended on the doctrine of *respondeat superior*, which holds an employer vicariously—and jointly and severally—liable for the tortious conduct of an employee, where it has

---

8. As stated above, the court also entered summary and final judgments in favor of STA, but appellants' appeals from those rulings have been dismissed voluntarily.

been shown that the employee was acting within the scope of the employment relationship at that time. *S. Mgmt. Corp. v. Taha,* 378 Md. 461, 480–81, 836 A.2d 627 (2003). "For an employee's tortious acts to be considered within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer." *Id.* at 481, 836 A.2d 627.

First, appellants cite *Sawyer v. Humphries,* 322 Md. 247, 260–61, 587 A.2d 467 (1991), which in turn cites *Cox v. Prince George's County,* 296 Md. 162, 170–71, 460 A.2d 1038 (1983), to argue that "[w]hether an individual's conduct falls within the scope of employment is normally a question for the jury." But this is not a rule or principle of law; appellants have merely asserted a statistical fact that, based on two cases, is nothing more than speculation. While it may well be true that in "most" cases—*i.e.* "normally"—the scope of employment is a question that must go to the jury, that nevertheless *depends upon the facts alleged.* Appellants would have us abandon the rules of summary judgment simply because the complaint alleged, baldly, that Richardson's tortious conduct occurred within the scope of his employment by Ports. This cannot be so, as that would obviate review as a matter of law. Thus, we resort to the underlying rule of summary judgment and we must determine, *de novo,* whether appellants' allegations and the limited evidence could, taken in the most favorable light, establish that the accident occurred within the scope of his employment by Ports.

The parties agree that there is a general principle, known as the "going and coming" rule, holding that "absent *special circumstances,* an employer will not be vicariously liable for the negligent conduct of his employee occurring while the employee is traveling to or from work." *Dhanraj v. Potomac Electric Power Co.,* 305 Md. 623, 628, 506 A.2d 224 (1986) (emphasis added).

There are two possible interpretations of the "special circumstances" exception in *Dhanraj.* The first, as appellants argue, is that it includes the "special mission" exception from

cases applying what is now the Workers' Compensation Act, such as *Reisinger–Siehler Co. v. Perry,* 165 Md. 191, 167 A. 51 (1933), and *Director of Finance v. Alford,* 270 Md. 355, 311 A.2d 412 (1973). *See* Maryland Code (1991, 2008 Repl.Vol.), § 9–101 et seq. of the Labor and Employment Article. In broad strokes, the "special mission" exception holds an employer liable if an employee is injured while commuting to or from "an extra, after-hours duty." *See Alford,* 270 Md. at 362, 311 A.2d 412 (quoting *Maryland Paper Products Co. v. Judson,* 215 Md. 577, 585, 139 A.2d 219 (1958)).

 Appellants acknowledge that, "[a]lthough analysis under Workmen's Compensation law differs from that conducted under tort law due to policy considerations, *Dhanraj,* 305 Md. at 630–31 [506 A.2d 224], the *Barnes [v. Children's Hosp.,* 109 Md.App. 543, 564, 675 A.2d 558 (1996),] special mission or errand exception should be applied." We cannot discern why appellants chose our opinion in *Barnes* to make this point, because that case was decided under the law of worker's compensation. Had it been a tort case, *Barnes* would support appellants' proposition, but it would also contradict the Court of Appeals' holding in *Dhanraj,* which expressly refused to apply a "special mission" exception to *respondeat superior:*

> Appellants urge us to apply the special mission exception to the workmen's compensation version of the "going and coming" rule. They cite to *Reisinger–Siehler Co. v. Perry,* 165 Md. 191, 167 A. 51 (1933) and *Director of Finance v. Alford,* 270 Md. 355, 311 A.2d 412 (1973). We see no need to resort, in the circumstances here, to cases under the Workmen's Compensation Act and comparable employee compensation statutes to determine the applicability of the doctrine of *respondeat superior* in this tort action.

*Dhanraj,* 305 Md. at 630–31, 506 A.2d 224. We therefore reject appellants' contention that the "special mission" exception applies to *respondeat superior* cases.

Instead, the *Dhanraj* Court rested its analysis on three factors that indicate "special circumstances," thus attaching

vicarious liability even though an employee is merely "coming and going" from work:

> We conclude that if Sandy was negligent as alleged, PEPCO was not vicariously liable for his tortious conduct under the doctrine of *respondeat superior*. PEPCO did not *expressly or impliedly consent* to the use of the automobile; it had no *right to control* Sandy in its operation, and the use of the automobile was not of such *vital importance in furthering PEPCO's business that the control over it might reasonably be inferred.*

*Id.* at 631, 506 A.2d 224 (emphasis added).

■ Under the holding in *Dhanraj*, the requisite "special circumstances" must admit some express or implied *control* over the vehicle or *consent* to its use in *performing work duties*.[9] This theme was reinforced by *Oaks v. Connors*, 339 Md. 24, 31, 660 A.2d 423 (1995), where the Court of Appeals, citing *Dhanraj* (among other authorities), explained:

> The "right to control" concept is key to a *respondeat superior* analysis in the motor vehicle context. The doctrine may only be successfully invoked when an employer has either expressly or impliedly, authorized the servant to use his personal vehicle *in the execution of his duties,* and *the employee is in fact engaged in such endeavors at the time of the accident.*

(Internal citations and quotation marks omitted; emphases added.)

The *Oaks* Court reviewed the record facts and upheld judgment in favor of the employer based on the Court's conclusion that the facts did not suffice for *respondeat superior*.[10] 339 Md. at 30–33, 660 A.2d 423. The facts and allega-

---

**9.** In some sense, this is no more than a natural extension of the basic *respondeat superior* test. We note, however, that it may be useful to use a separate label for these "special circumstances," because they may be easily overlooked.

**10.** Judgment in *Oaks* was granted under Rule 2–519(b), which, like a motion for summary judgment, requires the court to consider the

tions in this case compel a similar conclusion and distinguish it from cases in which "special circumstances" were present. As in *Oaks*, Richardson was not furthering Ports' business purposes because he was not "performing designated job responsibilities at the time of the accident." *See id.* at 32–33, 660 A.2d 423. Ports did not require Richardson to have a vehicle available for use in the execution of his duties. *Id.* Ports did not exercise control over the method or means by which Richardson operated his vehicle.[11] *Id.* Finally, Ports did not reimburse Richardson for his transportation expenses. *Id.*

The sole fact that distinguishes the present case—and this is perhaps only because it was not raised and considered in previous cases—is that Ports provided a parking lot for its employees. Appellants point to the size of the parking lot and the lack of other rest facilities at the shipyard to bolster their claim that it was wholly foreseeable that commuting longshoremen would pose a risk of harm to others. Foreseeability, however, is not the relevant test. According to the principles reviewed above, employee parking would only satisfy the special circumstances test if it indicated express or implied control over the vehicle as a means of transportation or consent to its use in performing work duties. The test would be satisfied if, for example, Ports offered parking because it required employees to drive to and from work, or because its employees used their vehicles in the actual loading and unloading of ships at port. In any event, the parking lot is ancillary to a more fundamental issue of control. As it happened, employee parking was no more than a convenience offered to those who chose to drive; it did not indicate any degree of control, the touchstone of *respondeat superior.*

For the forgoing reasons, we cannot accept appellants' argument that the "special mission or errand" exception to *respondeat superior* applies; nor can we accept the argument

---

evidence in a light most favorable to the non-movant. *See Oaks,* 339 Md. at 30, n. 4, 660 A.2d 423.

**11.** Below, we explore the extent and impact of Ports' *influence on*—as opposed to *control over*—Richardson's driving.

that the record facts establish "special circumstances" that override the "coming and going" rule. Appellants have thus demonstrated no error in the trial court's ruling that Ports is not vicariously liable for Richardson's tortious conduct as a matter of law.

## II.

Appellants next argue that, regardless of whether Ports is liable under the doctrine of *respondeat superior,* Ports breached its direct duty to the public "not to allow and/or encourage their employees to work in excess of a reasonable number of hours beyond the normal human tolerance."

## A.

■ As an initial matter appellants assert that the trial court erred as a matter of law because, appellants having asserted a new duty in tort, the court's opinion did not explicitly address the factors set forth in *Grimes v. Kennedy Krieger Inst., Inc.,* 366 Md. 29, 86, 782 A.2d 807 (2001). We are not persuaded by this contention.

In *Grimes,* the Court of Appeals held that the relationship between researcher and research subject can give rise to a duty whose breach constitutes negligence. *Id.* at 93–94, 782 A.2d 807. In reaching this holding, the Court recited the standard—albeit nebulous—definition of "duty" in negligence as " 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' " *Id.* at 86, 782 A.2d 807 (citing *Ashburn v. Anne Arundel County,* 306 Md. 617, 627–28, 510 A.2d 1078 (1986); quoting *Prosser and Keeton on Torts* § 53 (W. Keeton 5th ed.1984)).

Importantly, the *Grimes* Court explained that there is "no set formula" for inventing a duty, which, as Dean Prosser famously noted, is "not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Prosser and Keeton on Torts* § 53,

quoted in *Grimes,* 366 Md. at 86, 782 A.2d 807. The *Grimes* Court then recited several factors for consideration when determining whether a defendant owed a—previously unarticulated—duty to the plaintiff:

> In broad terms, these policies include: "convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, [and] the moral blame attached to the wrongdoer...." [Prosser § 53]. As one court suggested, there are a number of variables to be considered in determining if a duty exists to another, such as:
>
>> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Grimes,* 366 Md. at 86, 782 A.2d 807 (quoting *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 434, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976)).

Nothing in *Grimes* or any other case we are aware of indicates that a court must weigh *every* factor to determine whether a tort duty exists. Moreover, we do not see how this could be the case when certain of the factors enunciated in *Grimes,* such as "foreseeability," are *necessary conditions* of tort liability. In that case, it would be unnecessary to force the court to scrutinize every other factor that could give rise to duty or liability. We therefore decline to hold that the trial court erred as a matter of law by failing to consider all factors announced in *Grimes* or elsewhere in case law to determine whether to impose a duty not expressed in precedent.

Our decision, however, does not turn on "duty;" nor does our decision turn on the narrow issue of whether Ports had some "special relationship" with either Richardson or the

public that could give rise to a duty. Instead, any error in either of these dimensions was harmless because the alleged facts do not demonstrate the requisite proximity of cause and effect.[12]

## B.

■ The parties agree that, regardless of appellants' theory of liability, there must be a causal link between Ports's actions and the alleged injuries. Specifically, Ports' actions must be a "proximate cause" of the injuries, which is to say that the actions are both "1) a cause in fact, and 2) a legally cognizable cause." *Hartford Ins. Co. v. Manor Inn,* 335 Md. 135, 156–57, 642 A.2d 219 (1994), *accord Pittway Corp. v. Collins,* 409 Md. 218, 243, 973 A.2d 771 (2009).

It is widely accepted that causation in fact, otherwise known as "but-for" causation, cannot serve as a sole determinant of liability because it is overly broad:

The "but for" test has some value in the determination of causation. If a set of facts cannot pass the "but for" test, causation in fact is ruled out. The converse is not true—if a fact situation passes the "but for" test, the requisite causation is not necessarily established. That is so because the literal application of the "but for" test may fail to exclude causation links that are metaphysically conceivable but practically and legally absurd. But for the fact that the negligence of Driver A in blocking an intersection caused Driver B to be delayed two minutes, Driver B would not have arrived at a subsequent intersection two miles away when he did, and would not have collided with Driver C at that intersection. But for the fact that an employee is injured on the job and temporarily disabled, he would not have been

---

**12.** Appellants also argued that four facts relevant to duty are in dispute: "foreseeability," "knowledge," "control," and "whether Richardson's commute constitutes special circumstances or furthered [Ports'] business." The last two of these issues are obviated by our discussion of *respondeat superior,* above. The first two are essentially the same issue, *viz.,* "foreseeability," which we discuss with regard to proximate causation, below.

at home on a normal work day and would not have fallen down his cellar stairs, tripped on a garden hose, etc. These illustrations may pass the "but for" test, but causation in any meaningful sense, whether in the context of tort law or workers' compensation law, is simply not present.

*Mackin & Assocs. v. Harris,* 342 Md. 1, 8, 672 A.2d 1110 (1996).

The difference between "causation in fact" and "proximate causation" is, in some sense, the difference between a "necessary" and a "sufficient" condition. As the *Mackin* Court explained, for any given injury, there are innumerable acts whose absence would have prevented the harm. All of those acts are captured by the "but for" test as *necessary conditions* of the harm. Put differently, the "but for" test captures the logic of necessity by asking whether the harm would have resulted *without* the action in question. If that is *not* the case, then the action is a necessary cause of the harm, or a "cause in fact."

Necessity, however, is too broad to determine tort liability. Thus, we restrict liability to those actions that are "proximate" causes of harm, a principle perhaps best expressed in Judge Forsyth's opinion from *Bloom v. Good Humor Ice Cream Co.,* 179 Md. 384, 387, 18 A.2d 592 (1941):

> Variously stated, the universally accepted rule as to the proximate cause is that, unless an act, or omission of a duty, or both, are the direct and continuing cause of an injury, recovery will not be allowed. The negligent acts must continue through every event and occurrence, and itself be the natural and logical cause of the injury. It must be the *natural and probable consequence* of the negligent act, unbroken by any intervening agency, and where the negligence of any one person is merely passive, and potential, while the negligence of another is the moving and effective cause of the injury, the latter is the proximate cause and fixes the liability.

(Emphasis added.) In other words, the act must *suffice* to cause the injury, so that we would not expect to see the cause without the harm naturally following.[13]

More recently, the *Mackin* Court, quoted above, explained that the law of "proximate causation" is guided by a sensibility similar to what makes a "duty," that being our social standards:

> We have said that in considering the question of proximate cause it is well to keep in mind that it is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm, and to avoid the attachment of liability where ... it appears 'highly extraordinary' that the negligent conduct should have brought about the harm.

*Mackin*, 342 Md. at 10, 672 A.2d 1110 (citing *Henley v. Prince George's County*, 305 Md. 320, 334, 503 A.2d 1333 (1986)).[14]

■ In this case, however, it cannot be said that the casual connection between Ports' conduct and the alleged harm was "unbroken by any intervening agency." Instead, Richardson inserted himself as an independent agent, subject to laws that regulate his conduct and punish his transgressions. Richardson had previously exercised his right to seek gainful employment of his choosing—*i.e.*, as a longshoreman—and he made an independent decision to live at a considerable distance, knowing that he could be called on to work long shifts at any given time, and, finally, decided to drive home at the conclusion of one such assignment.[15] Because of Richardson's intervening agency, the injury in this case does not follow as a

---

13. Contrast this with the test for a necessary condition, which is violated if we expect the harm *without the cause*.

14. While *Mackin* was a workers' compensation case, its discussion of proximate causation is drawn from cases of general tort. *See Henley*, 305 Md. at 333–34, 503 A.2d 1333.

15. The fact that, over the course of time, longshoremen have moved farther from the shipyard than in generations past does not automatically relieve Richardson of responsibility for his individual life choices, if they result in an increased risk of harm to others.

"natural and probable consequence" of Ports employing him and compensating him for working long hours. Therefore, we cannot conclude that Ports' actions were the proximate cause of Richardson's accident and Barclay's injuries.

## C.

Although we have disposed of this case on the grounds of proximate causation, we wish to make clear that our opinion does not—as Ports would have us—hold that an employer has no duty to protect the public from risks that its employees pose, other than that imposed by *respondeat superior*. There is no authority for this proposition, and it seems unwise to make that doctrine the *sine qua non* of an employer's liability.[16]

This point and our opinion are made clearer in contrast with the out-of-state cases that appellants cite to bolster their argument. In those cases that we find persuasive, there was an element of unforeseeability clouding the employee's ability to mitigate the risk of his or her work, so that the employee could not be considered independently responsible for the tort.[17] In *Bussard v. Minimed, Inc.*, 105 Cal.App.4th 798, 801, 129 Cal.Rptr.2d 675 (Cal.App.2003), the employer hired a pest control company to spray pesticide overnight and a "clerical employee" attributed her motor tort to her exposure, which

---

**16.** Because the doctrine of *respondeat superior* hinges on the question of control, it could be interpreted as a fact from which proximate causation necessarily follows, and that for policy reasons requires strict liability. *See* William L. Prosser, "The Assault upon the Citadel (Strict Liability to the Consumer)," 69 Yale Law Journal 1099, 1134 (1960) ("[S]trict liability is familiar enough in the law of animals, abnormally dangerous activities, nuisance, workmen's compensation, and respondeat superior.").

**17.** While this case does not warrant a full discussion, we note that foreseeability and proximate causation are intertwined. *See Henley*, 305 Md. at 333–34, 503 A.2d 1333 (citing *Prosser and Keeton on The Law of Torts* § 53 (W. Keeton 5th ed. 1984)) ("[T]he limitation of causation by the use of the modifier 'proximate' and the limitation of duty by the requirement of foreseeability are fundamentally similar.").

caused her to become "dizzy and lightheaded."[18] *Faverty v. McDonald's Restaurants,* 133 Or.App. 514, 517–18, 892 P.2d 703 (Or.Ct.App.1995), presented facts closer to the case at hand. In *Faverty,* the employer violated its stated scheduling policy and had an eighteen-year-old employee work twelve-and-a-half out of seventeen consecutive hours. *Id.* at 517–18, 892 P.2d 703.

The point we wish to make is that the employers in these cases unexpectedly caused their employees to endanger others, thereby placing the employee in a position where he or she could not reasonably mitigate the attendant risks. As such, injury to third parties was a natural and probable consequence of the employers' actions.[19]

The undisputed facts of this case, by contrast, charged Richardson with the knowledge that his employment posed a risk to third parties, and the law required him to mitigate that harm, lest he be liable for breaching his duty of general care. Most telling in this case is the undisputed fact that there had been a limit on the number of hours worked that was eliminated from the ILA's collective bargaining agreement. Although the parties disagree as to why it was removed, there is no dispute that long hours were a known and anticipated part of Richardson's employment.[20] As such, Ports' actions are no

---

**18.** *Bussard* was decided on the doctrine of *respondeat superior,* 105 Cal.App.4th at 803, 129 Cal.Rptr.2d 675. Because that opinion did not reach the question of proximate causation, the doctrinal difference does not affect our distinction.

**19.** Even if this case were similar to those, any decision would still have to address whether the employer owed a duty to the third party. We do not reach this issue, and while there is currently no authority adopting appellants' proffered doctrines of third-party liability from the draft Third Restatement of the Law of Torts, we note that a different case— such as those we distinguish—may present valid reasons to do so.

**20.** Even if, as appellants argue, Ports compensated its employees at some higher rate for longer shifts, we would not consider it proof of proximate causation. Indeed, it may be beneficial to *encourage* that sort of escalating payment if demanded by employees to compensate them for mitigating the risk of traveling home after a long shift, perhaps by arranging alternative transportation or lodging near the workplace.

more proximate than those of the company that manufactured his vehicle. Ports actions were perhaps necessary, but not sufficient, to cause the harm under ordinary circumstances, wherein Richardson would be expected to act so as not to endanger third parties.

For these reasons, the record facts and allegations, even when taken in a light most favorable to appellants, establish that Ports' actions were not the proximate cause of Barclay's injuries, and therefore Ports cannot be liable for them as a matter of law.[21] Consequently, Ports cannot be liable to Briscoe for indemnity or contribution. Any error in the court's reasoning was harmless, and Ports was entitled to judgment as a matter of law on both Barclay's direct claims and Briscoe's cross-claims.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

---

Neither party denies that the economic benefits of long shifts can outweigh the cost of mitigating any resultant risks, and we would be remiss to punish an employer who provides that employment opportunity simply because one party fails to take necessary precautions against foreseeable risks. All of this is not to say that the employee's intent to mitigate harm at the time of contracting is *necessary* to avoid employer liability; we merely raise this point to show that payments are not a reliable indicator of proximate causation, *ipso facto*.

21. Because this case is subject to further proceedings in related matters, we note that we have assumed that Richardson fell asleep at the wheel solely for purposes of this summary judgment review.