47 A.3d 560

Michael S. BARCLAY, et ux.

v.

Lena BRISCOE, et al., Lena Briscoe, Personal Representative
of the Estate of Christopher Eugene Richardson

v.

Ports America Baltimore, Inc.

No. 41, Sept. Term, 2011.

Court of Appeals of Maryland.

June 27, 2012.

Henry L. Belsky (Victor D. Sobotka of Schlachman, Belsky & Weiner, P.A., Baltimore, MD; Gregory E. Hammond, Allstate Insurance Company, Baltimore, MD), on brief, for Petitioners/Cross–Respondents.

JoAnne Zawitoski (Alexander M. Giles and Teresa Kelly of Semmes, Bowen & Semmes, Baltimore, MD), on brief, for Respondents/Cross–Petitioners.

Deborah J. La Fetra, Adam R. Pomeroy, Theodore Hadzi–Antich, Pacific Legal Foundation, Sacramento, CA, for Amicus Curiae brief of Pacific Legal Foundation in Support of Appellee/Cross–Petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

GREENE, J.

A motorist was seriously injured when another car, operated by Christopher Richardson, crossed the center line, causing a head-on collision. The facts presented in the pleadings indicated that Richardson, a longshoreman, fell asleep at the wheel while traveling home after working a twenty-two hour shift at his job site located at the Port of Baltimore. The injured motorist, Sergeant Michael Barclay, and his wife, Robin Barclay, (collectively, "Petitioners" or "the Barclays") filed a complaint in the Circuit Court for Carroll County against several parties, including Richardson's employer, Ports America Baltimore, Inc. ("Ports"[1] or "Respondent").

---

1. At the time of the complaint Ports was doing business as "P&O Ports Baltimore, Inc." As a result, the trial court, and the parties often refer

The complaint alleged that Ports was liable for Sgt. Barclay's injuries under two theories, *respondeat superior*, and primary negligence in failing to protect the general motoring public from an employee driving home following an unreasonably long shift. Ports filed a motion for summary judgment asserting that neither theory was grounds for relief under the facts presented. First, Ports argued that *respondeat superior* was inapplicable because Richardson was not acting within the scope of his employment while commuting home from work. Second, Ports contended that it could not be held primarily liable for the injuries because it owed no duty to the public to ensure that an employee was fit to drive his personal vehicle home. The trial court agreed with Ports and granted the motion. The Court of Special Appeals affirmed. We agree with the judgments entered in both courts and affirm the judgment of the Court of Special Appeals.

## FACTS AND PROCEDURAL HISTORY

On January 17, 2006, Christopher Richardson was traveling home from work in his personal vehicle, westbound on New Windsor Road in Carroll County, after completing a twenty-two hour shift as a longshoreman at Dundalk Marine Terminal located in the Port of Baltimore. At approximately 7:28 a.m., Richardson fell asleep at the wheel and crossed the center dividing line, causing a head-on collision with Sgt. Michael Barclay of the Anne Arundel County Police Department, who was traveling eastbound on his way to work. Richardson died in the collision and Sgt. Barclay suffered catastrophic injuries.

Richardson was a longshoreman, employed by Ports to operate machinery in order to load and unload vessels that entered the Port of Baltimore. On January 13, 2006, the captain of one such vessel, the "Saudi Tabuk," notified Ports that it would be late arriving to Baltimore. In an effort to put the ship back on schedule for its next destination, Ports agreed to have longshoremen working around the clock. In

to Ports as "P&O Ports." In this opinion we refer to the employer as "Ports."

order to assign longshore work, Ports would issue a "work order" to the Steamship Trade Association ("the STA") directing it to dispatch longshoremen who were members of the International Longshoremen's Association ("the ILA") and possessed particular skills that would be required on the specific job. The STA would then offer the shifts to the longshoremen, according to their union seniority. Under the collective bargaining agreement ("CBA") in place at the time of the collision, a longshoreman could accept or decline a shift, and those who accepted could stay on for as many consecutive shifts[2] as desired, in order to maximize earnings, or alternatively, "check up," *i.e.,* leave work and go home, at which point the ILA would send the next most senior qualified longshoreman to finish the shift. Although a previous CBA had included a sixteen-hour limit on the workday, the provision had been removed under the agreement in effect at the time of the collision. Ports maintained that the limitation was removed at the insistence of the ILA, because it interfered with the assertion of the longshoremen's seniority rights. Richardson was initially offered a shift beginning on January 15, 2006, which he declined, and instead accepted an offer to work starting at 8 a.m. on Martin Luther King Day,[3] January 16, 2006. He stayed on the job until he finally "checked-up," at 6:00 a.m. on January 17th and began the commute that culminated in the tragic incident.

The Barclays filed a complaint in the Circuit Court for Carroll County on January 24, 2008. The complaint named as defendants Lena Briscoe, Personal Representative of the Estate of Christopher E. Richardson, Ports, the STA, and the ILA. The complaint alleged that defendants Ports, the STA,

---

**2.** As the intermediate appellate court recounted, "[s]hift lengths varied according to the time of day they would begin, and the CBA provided for a one-hour meal break every six hours." *Barclay v. Ports Am. Baltimore, Inc.,* 198 Md.App. 569, 573, 18 A.3d 932, 935 (2011).

**3.** A longshoreman would receive additional pay for working on a holiday, and Richardson received this benefit for choosing to work on Martin Luther King Day.

and the ILA[4] were vicariously liable for Richardson's negligence under the doctrine of *respondeat superior*, and that they also "breached their duty to the general public not to allow and/or encourage their employees to work in excess of a reasonable number of hours beyond the normal human tolerance," knowing that the employees commuted to and from work in their personal vehicles. On April 9, 2008, Briscoe filed cross-claims against the same defendants for indemnification. Ports and the STA moved for summary judgment on Barclay's direct claims and Briscoe's cross-claims. Following a hearing, the Circuit Court for Carroll County granted the motion on November 10, 2009. The court ruled first that Ports[5] could not be held vicariously liable for Richardson's acts under the applicable case law. The Circuit Court judge stated:

> [I]t is only when the employee is using his vehicle while carrying out the duties of his employment at the time of the accident that liability may be imposed on an employer.
>
> As P&O Ports correctly argues, Plaintiffs have not presented any evidence to demonstrate that P&O Ports expressly or impliedly consented to Mr. Richardson using his vehicle, let alone for a business purpose, at the time of the accident. Furthermore, the facts admissible as evidence do not indicate that Mr. Richardson's car was of such vital importance to P&O Ports' business that employer control over the vehicle could be inferred.

(Internal citation omitted.) The Circuit Court judge also rejected Petitioners' contention further discussed *infra*, that the "special mission" exception, developed within workers' compensation law, could be applied in the *respondeat superior* context.

---

**4.** Barclay voluntarily dismissed the claims against the ILA on August 1, 2008.

**5.** The Court made similar findings as to the STA, but because the STA is not a party to the appeal, we do not discuss those findings.

Lastly, the court rejected Barclay's argument that Ports was primarily, as opposed to vicariously, liable for allowing its employees to work an unreasonable amount of hours and then endanger the public by driving their personal vehicles home. The Court noted that, under Maryland law, Ports had no duty to protect third parties from fatigued employees acting outside the scope of employment in the absence of a "special relationship." The Circuit Court judge explained:

The only special relationship in which an employer could be liable for harm caused to third parties by his employee acting outside the scope of employment is provided in Section 317 of the Restatement (Second) of Torts. Section 317 explains that an employer may have a duty to protect third parties if an employee committed a tortious act on the employer's property or by using the employer's chattel. Furthermore, the employer must know or have reason to know that he has control over the employee and understands the necessity of exercising control. None of these requirements are met in this case, in that the automobile accident occurred on a public road while Mr. Richardson was driving his own vehicle. Plaintiffs have not introduced any facts to show that P&O Ports had the authority to control Mr. Richardson's driving to and from work. This Court does not find that a special relationship existed which would create a duty by P&O Ports to protect a third party.

Following this disposition, and pursuant to the Barclays' motion, the Circuit Court judge stayed proceedings between the Barclays and Briscoe, Personal Representative of the Estate of Christopher Richardson, and entered final judgments[6] in favor of the STA and Ports. The Barclays then

6. Because the summary judgments in favor of Ports and STA, although dispositive as to those parties, did not dispose of all of the claims against all of the parties in the action, they would not ordinarily be subject to immediate appeal. *See* Md. Rule 2–602; *Silbersack v. AC & S, Inc.*, 402 Md. 673, 678, 938 A.2d 855, 857 (2008) ("[U]nless otherwise provided by law, the right to seek appellate review in this Court or the Court of Special Appeals ordinarily must await the entry of a final judgment that disposes of all claims against all parties...." (citations

omitted)); *Planning Bd. of Howard Cnty. v. Mortimer*, 310 Md. 639, 647, 530 A.2d 1237, 1241 (1987) (Maryland Rule 2–602 views "an action involving multiple claims or multiple parties as a single judicial unit ordinarily requiring complete disposition before. a final appealable judgment may be entered."). The trial judge, however, may enter final judgment on less than all of the claims against all of the parties in a given action, for purposes of appeal, if he or she certifies that there is "no just reason for delay," and explains the rationale behind the conclusion. *See* Md. Rule 2–602(b); *Miller Metal Fabrication, Inc. v. Wall*, 415 Md. 210, 217, 999 A.2d 1006, 1010–11 (2010).

In *Miller Metal*, we held that, appellate deference to a certification is nullified where the trial court fails to articulate the reasoning behind its finding that there is "no just reason for delay" under Md. Rule 2–602(b). *Miller Metal*, 415 Md. at 227–28, 999 A.2d at 1017. In that situation, the "order only will be a valid exercise of the trial court's discretion if the record clearly demonstrates the existence of any hardship or unfairness sufficient to justify discretionary departure from the usual rule establishing the time for appeal." *Miller Metal*, 415 Md. at 228, 999 A.2d at 1017 (internal quotations and citations omitted). This appellate determination aims to balance the equitable considerations with the judicial administrative interests implicated by the record. *See Miller Metal*, 415 Md. at 229–230, 999 A.2d at 1017–18; *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165–66 (11th Cir.1997). Courts will often find "no just reason for delay" when delaying an appeal will have a significant adverse economic impact on the party seeking certification. *Miller Metal*, 415 Md. at 229, 999 A.2d at 1017. The factors most apparent in our case law, however, are those judicial administrative considerations weighing against certification. Thus, certification is not proper when "[t]he appellate court may be faced with having the same issues presented to it multiple times ... and partial rulings by the appellate court may do more to confuse than clarify the unresolved issues." *Miller Metal*, 415 Md. at 229, 999 A.2d at 1017–18 (quoting *Smith v. Lead Indus. Ass'n*, 386 Md. 12, 25–26, 871 A.2d 545, 553 (2005)).

In the instant case, although the trial judge did not explain the reasoning undergirding his certification, we are satisfied that the record supports the conclusion. The certification properly balanced the equitable considerations with the judicial administrative interests implicated by the record. Specifically, Sgt. Barclay suffered significant personal injury in the collision and incurred substantial medical bills. Considering the limited recovery likely from the Richardson estate, the trial judge may have recognized the financial hardship involved in Petitioners litigating against Richardson prior to an appeal, when meaningful recovery was primarily reliant on the liability of Ports and the STA. Most significantly, however, the risk was low in the instant case that an appellate court would be presented with the same issues in multiple appeals. *Cf. Miller*, 415 Md. at 230, 999 A.2d at 1018 (noting that, under the circumstances, "the risk [was] great that separate appeals presenting the same issues would arise and therefore certification would be an inefficient use of judicial resources."); *see Lead*, 386 Md. at 25, 871 A.2d at 553 ("The purpose of Rule 2–602(a) is to prevent piecemeal appeals, which, beyond being inefficient and costly, can

noted a timely appeal.[7] The Court of Special Appeals affirmed the trial court's grant of summary judgment. *Barclay v. Ports Am. Baltimore, Inc.*, 198 Md.App. 569, 18 A.3d 932 (2011). We granted Petitioners' request for a writ of certiorari, and now address the following questions, restated and reordered for brevity and clarity:

1) Did the Circuit Court err in granting the motion for summary judgment when disputes of material fact existed?

2) Can an employer be vicariously liable, under the "special circumstances" exception to the coming and going rule, for injuries suffered by a third party when an employee falls asleep at the wheel while driving home from an unreasonably long shift?

3) Do employers owe a duty to the motoring public to ensure that an employee not drive home when an extended work schedule caused sleep deprivation, increasing the likelihood that the employee could fall asleep at the wheel and cause injury to a third party?

---

create significant delays, hardship, and procedural problems."); *Mortimer*, 310 Md. at 645–46, 530 A.2d at 1240–41 ("In the context of multiple-claim or multiple-party litigation, or both, the purpose of the rules is to avoid the costs, delays, frustrations, and unnecessary demands on judicial resources occasioned by piecemeal appeals." (citations omitted)). First, it is clear that Richardson's negligence is not genuinely disputed; indeed, both Petitioners in their motion for authorization to file an appeal, and Respondents in their response, averred to the trial court that if summary judgment for the STA and Ports were upheld, Sgt. Barclay and his wife would likely settle with Richardson's estate. Secondly, even if a settlement were not reached, it cannot be said that the pending claim and the appeal "arise from a nexus of fact and law so intertwined that if we decide the one now, we may nonetheless face many of the same questions in determining the other later." *See Miller*, 415 Md. at 229, 999 A.2d at 1018 (quotation and citation omitted). Despite the fact that the allegations against Richardson and Ports arise from the same incident, an appeal regarding Ports' alleged vicarious and primary liability would not involve the same legal questions presented in an appeal regarding Richardson's negligence, thus a partial ruling on appeal would not confuse the unresolved issues. *See Miller*, 415 Md. at 229–30, 999 A.2d at 1018.

7. Petitioners later dismissed their appeal of the judgments in favor of STA, therefore, Ports is the sole Respondent in the instant case.

Respondent also filed a cross-petition for certiorari, which asked two questions. The first asked, in essence, whether the Court of Special Appeals erred by suggesting, in *dicta*, that an employer may be liable for injuries caused by a fatigued employee during the commute home where the employer scheduled the employee to work unexpectedly long hours. The second inquired, essentially, whether Petitioners' claim that Ports allowed its employees to work in excess of a reasonable number of hours is so intertwined with the terms of the Collective Bargaining Agreement ("CBA") that state law in this case is preempted by federal labor law. We do not reach the questions raised by the cross-petition.[8]

---

**8.** First, it is clear from our case law, that a party may not petition or cross-petition for certiorari from a judgment wholly in its favor. *See Wolfe v. Anne Arundel Cnty.*, 374 Md. 20, 25 n. 2, 821 A.2d 52, 55 n. 2 (2003) ("[O]ne may not appeal or cross-appeal from a judgment wholly in his favor." (quoting *Offutt v. Montgomery Cnty. Bd. of Educ.*, 285 Md. 557, 564 n. 4, 404 A.2d 281, 285 n. 4 (1979))), *accord, Unger v. State*, 427 Md. 383 n. 8, 48 A.3d 242, 2012 WL 1868904 (2012); *Bowen v. City of Annapolis*, 402 Md. 587, 618, 937 A.2d 242, 260 (2007). In the instant case, Ports prevailed in both the trial court and the Court of Special Appeals on the question of liability, and, therefore, cannot maintain a cross-petition for certiorari merely because it disagrees with *dicta* appearing in the intermediate appellate court's opinion. In any event, given our comprehensive examination of Maryland law, *supra*, it is not necessary for us to address this issue raised in the cross-petition, as such.

As to the second question raised in its cross-petition, Respondent concedes that "[t]he Court below properly refrained from interpreting the CBA in reaching its decision on the merits," but nevertheless, asserts that, to the extent Petitioners raise the CBA before this Court, any interpretation of the agreement is preempted by federal law. It is clear to us, however, that Petitioners refer this Court to the maximum-hour provision contained in a previous CBA, not for an interpretation of the terms of the agreement, but rather, in order to demonstrate Ports' prior recognition of fatigue as a safety issue, and its corresponding duty to the public to prevent the foreseeable harm. As the trial and intermediate appellate courts' opinions demonstrate, summary disposition of the negligence claim in this case did not depend on an interpretation of the CBA. Indeed, "as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement." *Batson v. Shiflett*, 325 Md. 684, 720, 602 A.2d 1191, 1209 (1992) (quoting *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 409–10, 108 S.Ct. 1877, 1883, 100 L.Ed.2d 410, 421 (1988)).

## STANDARD OF REVIEW

Under Maryland Rule 2–501, the grant of a motion for summary judgment is appropriate only "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Rule 2–501(f). As we recently stated in *Muskin v. State Dep't of Assessments & Taxation*, 422 Md. 544, 30 A.3d 962 (2011), "[w]hether a circuit court's grant of summary judgment is proper in a particular case is a question of law, subject to a non-deferential review on appeal." *Muskin*, 422 Md. at 554, 30 A.3d at 967 (citing *Conaway v. Deane*, 401 Md. 219, 243, 932 A.2d 571, 584 (2007); *Charles Cnty. Comm'rs v. Johnson*, 393 Md. 248, 263, 900 A.2d 753, 762 (2006)). Thus, "[t]he standard of review of a trial court's grant of a motion for summary judgment on the law is . . . whether the trial court's legal conclusions were legally correct." *Messing v. Bank of Am., N.A.*, 373 Md. 672, 684, 821 A.2d 22, 28 (2003) (citations omitted). "In reviewing a grant of summary judgment, we independently review the record to determine whether the parties generated a dispute of material fact and, if not, whether the moving party was entitled to a judgment as a matter of law." *Charles Cnty. Comm'rs*, 393 Md. at 263, 900 A.2d at 762 (internal quotation omitted). In determining whether a fact is material we have said that "a dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." *O'Connor v. Baltimore Cnty.*, 382 Md. 102, 111, 854 A.2d 1191, 1196 (2004) (quoting *Lippert v. Jung*, 366 Md. 221, 227, 783 A.2d 206, 209 (2001)); *see Matthews v. Howell*, 359 Md. 152, 161, 753 A.2d 69, 73 (2000) ("A material fact is a fact the resolution of which will somehow affect the outcome of the case." (quotation omitted)); *Lynx, Inc. v. Ordnance Prods., Inc.*, 273 Md. 1, 8, 327 A.2d 502, 509 (1974) (noting that a material fact is that which is "necessary to resolve the controversy as a matter of law[.]").

■ We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from the well-pled facts against the moving party. *D'Aoust v. Diamond,* 424 Md. 549, 574, 36 A.3d 941, 955 (2012) (citations omitted). Further, an appellate court ordinarily should limit its review of a grant of a motion for summary judgment to "only the grounds upon which the trial court relied in granting summary judgment." *MRA Prop. Mgmt. v. Armstrong,* 426 Md. 83 n. 17, 43 A.3d 397 (2012) (citing *River Walk Apartments, LLC v. Twigg,* 396 Md. 527, 542, 914 A.2d 770, 779 (2007)); *accord Messing,* 373 Md. at 684, 821 A.2d at 28 ("[W]e review the trial court's ruling on the law, considering the same material from the record and deciding the same legal issues as the circuit court." (citation omitted)).

Petitioners contend that there were material issues of fact that precluded the grant of summary judgment in this case. Specifically, they note disputes surrounding the extent of Ports' ability to control the work schedule of its employees and whether Ports had knowledge of both Richardson's fatigue and the fact that he was planning on driving home. Although we agree that these are factual disagreements, none of them rise to the level of materiality under our case law as the resolution of those facts would not affect the outcome of this case. *See D'Aoust,* 424 Md. at 575, 36 A.3d at 956; *O'Connor,* 382 Md. at 111, 854 A.2d at 1196; *Matthews,* 359 Md. at 161, 753 A.2d at 73; *Lynx,* 273 Md. at 8, 327 A.2d at 509. This is evident upon the consideration of the applicable precedent, to which we now turn.

## DISCUSSION

### I.

■ This Court has recognized consistently the doctrine of *respondeat superior,* as "it is hornbook law that an employer is ordinarily responsible for the tortious conduct of his employee committed while the servant was acting within the scope of the employment relationship." *Embrey v. Holly,* 293

Md. 128, 134, 442 A.2d 966, 969 (1982); *accord S. Mgmt. Corp. v. Taha,* 378 Md. 461, 480–81, 836 A.2d 627, 638 (2003); *Oaks v. Connors,* 339 Md. 24, 30, 660 A.2d 423, 426 (1995); *Dhanraj v. Potomac Electric Power Co.,* 305 Md. 623, 627, 506 A.2d 224, 226 (1986); Restatement (Second) of Agency § 219 (1958). The doctrine is based on the principle that "[b]ecause 'the master holds out his servant as competent and fit to be trusted, ... he in effect warrants his servant's fidelity and good conduct in all matters within the scope of his employment.'" *Oaks,* 339 Md. at 30, 660 A.2d at 426 (quoting *Globe Indem. Co. v. Victill Corp.,* 208 Md. 573, 580, 119 A.2d 423, 427 (1956)). We have stated that, "[f]or an employee's tortious acts to be considered within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer." *Taha,* 378 Md. at 481, 836 A.2d at 638 (citing *Sawyer v. Humphries,* 322 Md. 247, 255, 587 A.2d 467, 470 (1991)). Ordinarily, the issue of whether a particular act is within the scope of employment is properly decided by a jury, however, "where there is no conflict in the evidence relating to the question and but one inference can be drawn therefrom, the question is one of law for the court." *Sheets v. Chepko,* 83 Md.App. 44, 47, 573 A.2d 413, 414 (1990) (quotation omitted); *see Drug Fair of Md., Inc. v. Smith,* 263 Md. 341, 346–347, 283 A.2d 392, 396 (1971) ("We recognize that the issue of whether a servant is acting within the scope of his employment is ordinarily a question for the jury but this is so, only if there is a factual dispute." (citations omitted)); *Lewis v. Accelerated Express, Inc.,* 219 Md. 252, 256, 148 A.2d 783, 785 (1959) ("[U]nder proper circumstances, the question of an act being within the scope of an employee's employment may become one of law.").

We have twice considered, in depth, how the rule functions with respect to an employee's use of his or her personal automobile during a commute. In *Dhanraj v. Potomac Electric Power Co.,* 305 Md. 623, 506 A.2d 224 (1986), we said:

> [O]n account of the extensive use of the motor vehicle with its accompanying dangers, the courts have realized that a strict application of the doctrine of *respondeat superior* in the modern commercial world would result in great injus-

tice. . . . It is now held by the great weight of authority that a master will not be held responsible for [the] negligent operation of a servant's automobile, even though engaged at the time in furthering the master's business unless the master expressly or impliedly consents to the use of the automobile, and . . . had the right to control the servant in its operation, or else the use of the automobile was of such vital importance in furthering the master's business that his control over it might reasonably be inferred.

*Dhanraj*, 305 Md. at 627–28, 506 A.2d at 226 (quoting *Henkelmann v. Insurance Co.*, 180 Md. 591, 599, 26 A.2d 418, 422–23 (1942)). In *Dhanraj*, the plaintiff attempted to hold an employer liable for injuries an employee caused while operating his personal vehicle during a commute from his home to an employer-operated training facility. We upheld summary judgment in favor of the employer because the doctrine of *respondeat superior* could only "be properly invoked if the master has, expressly or impliedly, authorized the [servant] to use his [or her] personal vehicle *in the execution of his [or her] duties*, and the employee [wa]s in fact engaged in such endeavors at the time of the accident." *Dhanraj*, 305 Md. at 628, 506 A.2d at 226 (internal quotation and citations omitted). Under the facts presented, it was clear that

[a]side from the initial request for attendance . . . [the employer] was completely uninvolved in the travel aspect of the temporary assignment. [The employer] did not specify the mode of transportation or the route of travel. . . . [The employees'] workday started when they arrived at the training center and ended when they departed. All commuting was done on their own time.

*Dhanraj*, 305 Md. at 625, 506 A.2d at 225.

Indeed, we emphasized that "[i]t is essentially the employee's own responsibility to get to or from work." *Dhanraj*, 305 Md. at 628, 506 A.2d at 226 (citing Restatement (Second) of Agency § 229 cmt. d (1958)). Therefore, we announced that "the general rule is that absent special circumstances, an employer will not be vicariously liable for the negligent conduct of his employee occurring while the employee is traveling

to or from work." *Dhanraj,* 305 Md. at 628, 506 A.2d at 226. The employee in *Dhanraj* argued that the travel allowance was a "special circumstance" sufficient to establish the employer's consent to the use of the automobile and thereby invoke the doctrine of *respondeat superior. Dhanraj,* 305 Md. at 628–29, 506 A.2d at 226–27. We rejected that argument, noting that the allowance was not tied to a particular mode of transportation, but was paid to an employee merely for reporting to work, or leaving work from, a location outside of his or her "base zone." *Id.* It was clear under the facts:

> There was no consent, express or implied, by [the employer] to the use of [the employee's] automobile as the means of transportation to the training facility; [the employer] was not concerned with how he got there or how he got home at the close of the workday. [The employee] was entitled to the same allowance had he traveled in his own car, or as a passenger in another's car, or hired a taxicab, or walked, or even if he stayed for the [six-week training period] in a nearby motel. He used his automobile by his own choice and for his personal convenience; he was under no instruction, direction or duty to use it. The expense of the operation of the automobile was not born by [the employer], and [the employer] had no right of control over [the employee] in regard to it. The allowance paid did not represent maintenance of the automobile, nor was it based on the expense of its operation. In short, he could travel to and from the facility as he pleased, by any means or route he chose. [The employer's] only concern was that he take the course, not how he got there.

*Dhanraj,* 305 Md. at 630, 506 A.2d at 227.

We reviewed and reaffirmed the same principles in *Oaks v. Connors,* 339 Md. 24, 660 A.2d 423 (1995), where we again upheld a summary disposition in favor of the employer after a third party was injured by the alleged negligence of an employee commuting to work. In that case, the employer, Giant Food, Inc., required the employee to have a personal vehicle available for use in his duties as an ATM Sergeant, and would reimburse him for travel between his "home store" and

the stores he visited. At the time of the collision, however, the employee was commuting from his residence to his "home store" and therefore had not yet begun his workday. We again pointed out that "[d]riving to and from work is generally not considered to be within the scope of a servant's employment because getting to work is the employee's own responsibility and ordinarily does not involve advancing the employer's interests." *Oaks*, 339 Md. at 32, 660 A.2d at 427 (citing *Dhanraj*, 305 Md. at 628, 506 A.2d at 226, and Restatement (Second) of Agency § 229 cmt. d (1958)). We applied the rule enunciated in *Dhanraj* that, "absent special circumstances, an employer will not be vicariously liable for the negligent conduct of his employee occurring while the employee is traveling to or from work." *Oaks*, 339 Md. at 32, 660 A.2d at 427 (quoting *Dhanraj*, 305 Md. at 628, 506 A.2d at 226).

The plaintiffs in *Oaks* argued that the employee was executing his duties for Giant at the time of the collision because he was transporting his vehicle to the job site, which Giant required him to have for use in the course of the workday. *Oaks*, 339 Md. at 32–33, 660 A.2d at 427. We found this argument unavailing, focusing instead on the fact that the employee in driving to work "was not actually performing any of his designated job responsibilities at the time of the accident," and therefore, "was not furthering any business purpose" of his employer. *See Oaks*, 339 Md. at 32, 660 A.2d at 427. We explained further:

> Giant exerted no control over the method or means by which [the employee] operated his vehicle. It did not supply or pay for the vehicle that [the employee] used or for its maintenance, fuel or repair. It also did not specify the type of vehicle to be used or the route to be taken from the [home store]. Finally, the use of an automobile was not of such vital importance in furthering Giant's business that Giant's control over it, as [the employee] commuted to work, [could] reasonably be inferred.

*Oaks*, 339 Md. at 32–33, 660 A.2d at 427.

Petitioners draw a distinction between the instant case and *Dhanraj* and *Oaks*, namely that "the precipitating cause of the

accident, fatigue, manifested while Richardson was on the job and was directly related to the number of hours he worked" whereas "the employees in both *Oaks* and *Dhanraj* were in the automobile accidents prior to their shifts and the precipitating cause of the accidents did not manifest on the job." While Petitioners identify correctly this factual distinction, the timing of the collision is immaterial under the explicit language of those cases. *See Oaks,* 339 Md. at 32, 660 A.2d at 427 ("Driving to *and from* work is generally not considered to be within the scope of a servant's employment...." (emphasis added)); *Dhanraj,* 305 Md. at 628, 506 A.2d at 226 ("[A]bsent special circumstances, an employer will not be vicariously liable for the negligent conduct of his employee occurring while the employee is traveling to *or from* work." (emphasis added)). Further, on-the-job fatigue is not a "special circumstance" sufficient to prevent application of the general rule that "an employer will not be vicariously liable for the negligent conduct of his employee occurring while the employee is traveling to or from work." [9] *Dhanraj,* 305 Md. at 628, 506

---

**9.** To argue that on-the-job fatigue is such a circumstance, Petitioners cite *Van Devander v. Heller Electric Co.,* 405 F.2d 1108 (D.C.Cir.1968). Indeed, this case seems to stand for the whole of Petitioners' position, because, as Petitioners suggest, "the factual circumstances of *Van Devander* are directly on point with the case at hand." An essential difference, however, is that the case itself dealt with workers' compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. 902 (1957). In *Van Devander,* an employee claimed that he was entitled to workers' compensation after he fell asleep at the wheel while commuting home after a 26 hour shift. The Court agreed and stated that, although injuries sustained during a commute to or from work are not generally compensable:

Where the hazard of the journey, as here, "arises" out of and in the course of extraordinary demands of employment there is a discernible causal relationship upon which to justify the administrative tribunal in attributing the hazard to the employment and hence responsibility for the resultant injury. Continuous work assignment by the employer of this employee for 26 hours was an extraordinary demand and foreseeably exposed the employee to the kind of risk which led to his injury. An employer who calls for such extended effort has a variety of alternatives to protect from such a hazard—the engagement of an alert driver or a taxi or providing facilities for restorative rest before undertaking travel, to mention only a few. Hence there was a substantial evidentiary basis underlying the deputy commissioner's

A.2d at 226. Petitioners misconstrue *Dhanraj* as announcing, but failing to delimit, some type of "special circumstances" exception, which they argue was met in this case. It is clear that under *Dhanraj* and *Oaks*, any "special circumstances" must simply prove that the employee is, in fact, not only commuting to or from work, but additionally, is using his personal vehicle, as authorized by the employer, to engage in the execution of his duties on behalf of the employer.[10] *Dhan-*

---

finding that Appellant Van Devander's fatigue was a consequence of 26 hours of uninterrupted employment without rest and that this was the proximate cause of his falling asleep while driving home.
*Van Devander*, 405 F.2d at 1110. Petitioners, in quoting this language from *Van Devander*, ask us to allow the concept of "extraordinary demand" to "direct the interpretation of the definition of special circumstances in this circumstance of vicarious liability." We decline to do so as the subject of workers' compensation is not before us.

**10.** Petitioners argue that this Court should apply the workers' compensation principle, known as "special mission," *see e.g., Morris v. Bd. of Educ.*, 339 Md. 374, 663 A.2d 578 (1995); *Dir. of Fin. v. Alford*, 270 Md. 355, 311 A.2d 412 (1973); *Reisinger–Siehler Co. v. Perry*, 165 Md. 191, 167 A. 51 (1933); *Garrity v. Injured Workers' Ins. Fund*, 203 Md.App. 285, 37 A.3d 1053 (2012); *Barnes v. Children's Hosp.*, 109 Md.App. 543, 675 A.2d 558 (1996); *Huffman v. Koppers Co. Inc.*, 94 Md.App. 180, 616 A.2d 451 (1992), to the facts at bar in order to hold that Richardson was acting within the scope of his employment at the time of the collision. The "special mission" exception to the "going and coming rule," under the Workers' Compensation Act "provides that an employee is acting in the course of employment when traveling on a special mission or errand at the request of the employer and in furtherance of the employer's business, even if the journey is one that is to or from the workplace." *Garrity v. Injured Workers' Ins. Fund*, 203 Md.App. 285, 293–94, 37 A.3d 1053, 1057–58 (2012) (quoting *Barnes*, 109 Md.App. at 555–56, 675 A.2d at 564). In considering whether an employee was engaged in a special mission at the time of the injury, we have focused on factors such as whether there was urgency and an order which the employee was obliged to follow, such that an agreement could be inferred that the mission included commuting to and from the job site. *See Alford*, 270 Md. at 364, 311 A.2d at 417; *Reisinger*, 165 Md. at 195–99, 167 A. 51 at 52–54.

Although the general rule in both workers' compensation and *respondeat superior* jurisprudence is that an employee is not "on the job" while commuting to or from work, we decline, as we did in *Dhanraj*, to allow the special mission exception to inform our holding as to the doctrine of *respondeat superior* under the facts of this case. *Dhanraj*, 305 Md. at 630–31, 506 A.2d at 227–28. We note the different policy reasons underlying the Workers' Compensation Act and the doctrine of

*raj*, 305 Md. at 628, 506 A.2d at 226; *Oaks*, 339 Md. at 31, 660 A.2d at 427. Thus, even assuming, *arguendo*, that Ports forced Richardson to work for an unreasonable amount of time, and thereby contributed to the impairment which ultimately caused the collision, this would be insufficient, as a matter of law, to create *respondeat superior* liability when it is undisputed that Richardson was traveling home from work, and not in any way attending to his employer's business.[11] It

*respondeat superior. See Alitalia Linee Aeree Italiane v. Tornillo*, 329 Md. 40, 44, 49, 617 A.2d 572, 574, 576 (1993) (noting "special mission" as one of several exceptions engrafted onto the "going and coming rule" of workers' compensation law in order to construe the statute "as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes as remedial social legislation." (citations omitted)); *Reisinger*, 165 Md. at 199, 167 A. at 54 ("There is a tendency of the courts ... to give to such Compensation Acts an interpretation as broad and liberal in favor of the employee as their provisions will permit, in furtherance of the humane purpose which prompted their enactment." (quotation omitted)); *Henderson v. AT & T Info. Sys., Inc.*, 78 Md.App. 126, 139, 552 A.2d 935, 941 (1989) ("To obtain compensation benefits all that an employee need do is establish that his injury was caused by an activity related to his job.... However, *respondeat superior* mandates that the employee be either under the control of the employer at the time of the injury or that he could have been. Whereas qualifying for workers' compensation benefits requires only that the injury [arise] out of and in the course of employment, recovery under the doctrine of *respondeat superior* necessitates that the employee be acting in the scope of his employment, a much narrower test." (quotation omitted)); *Luth v. Rogers & Babler Constr. Co.*, 507 P.2d 761, 764 (Alaska 1973) (refusing to apply a workers' compensation exception to the "going and coming rule" in a *respondeat superior* context, noting that workers' compensation focuses on "relatedness" to one's job, whereas, "[by] contrast, *respondeat superior* subjects employers to liability for injuries suffered by an indefinite number of third persons. To limit this burden of liability, the narrower concept, "scope of employment," has long been tied to the employer's right to control the employee's activity at the time of his tortious conduct."); *Jones v. Blair*, 387 N.W.2d 349, 355 (Iowa 1986) (noting that, due to a difference in scope, "[t]he rules adopted for workers' compensation cases should not be automatically and mechanistically applied in negligence cases involving the doctrine of *respondeat superior*."); *Beard v. Brown*, 616 P.2d 726, 736 (Wyo.1980) ("To be injured within the course or scope of one's employment in the context of the workers' compensation system is not the same thing as to be in the course or scope of one's employment and cause injury to a third person who is foreign to the employee and the employee relationship....").

**11.** Petitioners cite *Bussard v. Minimed, Inc.*, 105 Cal.App.4th 798, 129

is not, as Petitioners argue, a question of Ports' control over Richardson's fatigue, *i.e.*, scheduling him to work long hours, rather, the pertinent inquiry centers on the employer's influence over the operation of the vehicle. *See Dhanraj*, 305 Md. at 628, 506 A.2d at 226 ("The application of the doctrine rests

---

Cal.Rptr.2d 675 (2003) to argue that Richardson was acting within the scope of his employment at the time of the collision. In that case, an employee caused a collision while driving home after becoming ill as a result of pesticides sprayed at her worksite. She explained to the responding police officer that she had felt dizzy and lightheaded from the pesticides before the collision. In determining whether the employer was vicariously liable for the third party's injuries, the court noted that California had defined "scope of employment" broadly, to include "acts necessary to the comfort, convenience, health, and welfare of the employee while at work, [even] though strictly personal and not acts of service...." *Bussard*, 105 Cal.App.4th at 803–04, 129 Cal.Rptr.2d 675. Recognizing that, generally, an employee is not within the scope of employment when commuting to and from his or her place of employment, the court pointed to an exception where an employee foreseeably "endangers others with a risk arising from or related to work." *Bussard*, 105 Cal.App.4th at 804, 129 Cal.Rptr.2d 675. The California court found additional justification for this exception in California cases holding an employer vicariously liable when an employee caused an accident while driving home after consuming alcohol at work. *Bussard*, 105 Cal.App.4th at 805, 129 Cal.Rptr.2d 675. Thus, the court noted that "[s]o long as the risk is created within the scope of the employee's employment, the scope of employment must follow the risk so long as it acts proximately to cause injury." *Bussard*, 105 Cal. App.4th at 805–06, 129 Cal.Rptr.2d 675 (citation omitted).

Petitioners argue, citing *Bussard*, that "Richardson's falling asleep and losing control of his vehicle was the natural and foreseeable consequence of the fatigue which manifested while on the job and awake for an extended number of hours." Petitioners' reliance on this case, however, is misplaced. Maryland law does not define "scope of employment" so expansively. *See Dhanraj*, 305 Md. at 627–28, 506 A.2d at 226; *Oaks*, 339 Md. at 30–32, 660 A.2d at 426; *Henkelmann*, 180 Md. at 599, 26 A.2d at 422–23. Further, our intermediate appellate court in *Kuykendall v. Top Notch Laminates, Inc.*, 70 Md.App. 244, 520 A.2d 1115 (1987), specifically rejected a principal rationale undergirding *Bussard* by holding that an employer could not be held vicariously liable for the off-duty motor tort of an employee who became intoxicated at a work function. *Kuykendall*, 70 Md.App. at 250, 520 A.2d at 1117 (analyzing the facts in light of *Dhanraj* and concluding that, "there is nothing in the complaint to indicate that [the employee] while driving home was furthering any business purpose of his employer."). As explained *infra*, we adopt the reasoning of that case regarding the primary negligence of an employer, however, it is an equally sound application of Maryland's *respondeat superior* doctrine.

upon the power of control and direction which the superior has over the subordinate, and ... does not arise when the servant is not actually or constructively under the direction and control of the master." (internal quotation omitted)); *Oaks,* 339 Md. at 31, 660 A.2d at 426–27 ("The 'right to control' concept is key to a *respondeat superior* analysis in the motor vehicle context."); *Henkelmann,* 180 Md. at 599, 26 A.2d at 423 (noting that in order to be vicariously liable an employer must have "the right to control the servant in [the vehicle's] operation...."); Restatement (Second) of Agency § 219 cmt. a (1958) (noting that "[a] master's liability to third persons appears to be an outgrowth of the idea that within the time of service, the master can exercise control over the physical activities of the servant.... The assumption of control is a usual basis for imposing tort liability when the thing controlled causes harm.").

 Further, we note that the facts as to scope of employment in the instant case are even less persuasive than those presented in *Dhanraj* and *Oaks.* Unlike the employer in *Dhanraj,* Ports neither provided any type of travel allowance[12] to Richardson, nor did it, as in *Oaks,* mandate that the employee have a personal vehicle for use in the course of employment. Richardson chose to drive to and from work for his own convenience. Even after his shift, there were any number of other options open to Richardson if he felt too tired

---

**12.** We reject as insufficient Petitioners' claim that Richardson's additional three hours of incentive pay was meant to compensate him for the inconvenience of commuting home by car after a long day's work. First, the record demonstrates that the "incentive pay" or "premium pay" was for performance "above the call of duty," as determined by a supervisor, and influenced by such things as the special skill of the laborer, and the operational challenges of a particular vessel. It was not tied to shift length, because the pay records for the Saudi Tabuk show that Richardson was one of eight longshoreman who worked at least twenty-hours, and, as the intermediate appellate court noted, out of those eight, five received bonuses, while three did not. Further, there was no notation as to the method of commute on the pay records. Second, even assuming, *arguendo,* that this incentive pay was compensation for the commute, this would not be enough, by itself, to establish that Richardson was furthering Ports' business at the time of the collision. *See Dhanraj,* 305 Md. at 628–30, 506 A.2d at 226–27.

to drive, including traveling home by bus, calling a cab, phoning a family member or friend for a ride, or resting in a nearby motel room. Ports paid none of the expenses associated with operating the automobile, and Ports had no control over Richardson in regard to its operation nor was its use "of such vital importance in furthering the master's business that his control over it might [be] reasonably inferred." *See Dhanraj,* 305 Md. at 631, 506 A.2d at 228. Thus, Ports did not consent either expressly or impliedly to the use of Richardson's automobile as a means of transportation, and it had no interest in either how he got to work "or how he *got home at the close of the workday," Dhanraj,* 305 Md. at 630, 506 A.2d at 227 (emphasis added). In short, in accordance with our holdings in *Dhanraj* and *Oaks,* because Richardson was neither authorized to use his personal vehicle in the execution of his duties, nor engaged in those duties at the time of the collision, Ports may not be held vicariously liable for Richardson's motor vehicle tort. *See Dhanraj,* 305 Md. at 628, 506 A.2d at 226; *Oaks,* 339 Md. at 31, 660 A.2d at 427.

## II.

Petitioners next argue that Respondent is primarily, as opposed to vicariously, liable for Sgt. Barclay's injuries due to Respondent's own negligence in failing to prevent the risk that a fatigued employee posed to the general motoring public.[13] In order to prevail on a claim of negligence in Maryland, a plaintiff must prove the existence of: (a) a duty owed by the defendant to the plaintiff, (b) a breach of that duty, and (c) injury proximately resulting from that breach. *Pendleton v. State,* 398 Md. 447, 458, 921 A.2d 196, 202–03

---

13. The Court of Special Appeals relied on proximate causation in its analysis of the case at bar and elected not to discuss duty. *Barclay,* 198 Md.App. at 583–584, 18 A.3d at 940 ("Our decision, however, does not turn on 'duty;' nor does our decision turn on the narrow issue of whether Ports had some 'special relationship' with either Richardson or the public that could give rise to a duty. Instead, any error in either of these dimensions was harmless because the alleged facts do not demonstrate the requisite proximity of cause and effect." (footnote omitted)). As discussed *infra,* duty is a threshold question in any negligence action, and we shall dispose of the instant case on that element.

(2007). As we recently said in *Pace v. State,* 425 Md. 145, 38 A.3d 418 (2012):

> Duty is a foundational element in a claim of negligence because, as we have said, "negligence is a breach of a duty owed to one, and absent that duty, there can be no negligence." *Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986); *accord Pendleton,* 398 Md. at 461, 921 A.2d at 204 ("[W]hen analyzing a negligence action it is customary to begin with whether a legally cognizable duty exists." (citations omitted)); *Bobo [v. State],* 346 Md. [706] at 714, 697 A.2d [1371] at 1375 [ (1997) ] ("[T]he existence of a duty is the threshold question."); *W. Va. Central R. Co. v. Fuller,* 96 Md. 652, 666, 54 A. 669, 671 (1903) ("[T]here can be no negligence where there is no duty that is due. . . ."). This Court has adopted Prosser and Keeton's definition of duty as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *See Remsburg v. Montgomery,* 376 Md. 568, 582, 831 A.2d 18, 26 (2003) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53 at 356 (5th ed. 1984)); *Horridge [v. St. Mary's County Dept. of Social Services],* 382 Md. [170] at 182, 854 A.2d [1232] at 1235 [ (2004) ]; *Ashburn,* 306 Md. at 627, 510 A.2d at 1083. As Prosser and Keeton note, "duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53 at 358 (5th ed. 1984) (internal quotation marks omitted). We have explained that in order to determine whether a duty exists, relevant considerations necessarily include "the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties." *Jacques v. First Nat'l Bank,* 307 Md. 527, 534, 515 A.2d 756, 759 (1986).

*Pace,* 425 Md. at 155–56, 38 A.3d at 424.

In the instant case, Petitioners assert that Ports had "a duty because the risk a fatigued employee poses to the

motoring public is foreseeable and the fatigue arose within the scope of [Ports'] employment relationship with Richardson." As we made clear in *Ashburn v. Anne Arundel County*, 306 Md. 617, 510 A.2d 1078 (1986), however, " 'foreseeability' must not be confused with 'duty.' The fact that a result may be foreseeable does not itself impose a duty in negligence terms." *Ashburn*, 306 Md. at 628, 510 A.2d at 1083; *accord Pendleton*, 398 Md. at 462, 921 A.2d at 205 ("While foreseeability is often considered among the most important of [the] factors, its existence alone does not suffice to establish a duty under Maryland law." (quotation omitted)); *Valentine v. On Target, Inc.*, 353 Md. 544, 551, 727 A.2d 947, 950 (1999) ("Notwithstanding the fact that foreseeability is a critical element in ascertaining whether or not a duty exists, not all foreseeable harm gives rise to a duty . . . ."). For this reason, the general rule followed in most jurisdictions, including Maryland, is that "there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person[14] or between the actor and the person injured." *Ashburn*, 306 Md. at 628, 510 A.2d at 1083 (citing *Lamb v. Hopkins*, 303 Md. 236, 242–44, 492 A.2d 1297, 1300–01 (1985); *Scott v. Watson*, 278 Md. 160, 166, 359 A.2d 548, 552 (1976); Restatement (Second) of Torts § 315 (1965)). This legal principle is set forth in Restatement (Second) of Torts § 315, which states that

> [t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

---

14. As we noted in *Lamb*, 303 Md. at 243, 492 A.2d at 1300–01, the particular special relationships between an actor and a third person that give rise to such a duty are set forth in Restatement (Second) of Torts §§ 316–19.

We have adopted § 315, as reflective of our common law, and as a special application of the general principle found in Restatement (Second) of Torts § 314 that "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." *Lamb*, 303 Md. at 242, 492 A.2d at 1300; Restatement (Second) of Torts § 315 cmt. a ("The rule stated in this Section is a special application of the general rule stated in § 314."). As we emphasized in *Valentine*, 353 Md. 544, 727 A.2d 947, "[o]ne cannot be expected to owe a duty to the world at large to protect it against the actions of third parties, which is why the common law distinguishes different types of relationships when determining if a duty exists." *Valentine*, 353 Md. at 553, 727 A.2d at 951. Therefore,

> [i]n the absence of either one of the kinds of special relations described in [§ 315], the actor is not subject to liability if he fails, either intentionally or through inadvertence, to exercise his ability so to control the actions of third persons as to protect another from even the most serious harm. This is true although the actor realizes that he has the ability to control the conduct of a third person, and could do so with only the most trivial of efforts and without any inconvenience to himself.

*Lamb*, 303 Md. at 242 n. 4, 492 A.2d at 1300 n. 4 (quoting Restatement (Second) of Torts § 315 cmt. b (1965)).

It is evident in the instant case that Ports had no special relationship with Sgt. Barclay, as it had no familiarity with or knowledge of him prior to learning of the collision. Further, Ports had no special relationship with its employee, Mr. Richardson, that would allow it to be responsible for his motor vehicle tort under the applicable facts. The Restatement (Second) of Torts § 317 explains the circumstances sufficient to establish a "special relationship" between an employer and an employee when the employee is acting outside the scope of his or her employment. *See Lamb*, 303 Md. at 243, 492 A.2d at 1301 (noting that "§ 317 establishes a master's duty to control the conduct of his servant...."). It states:

A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 317. It is not, nor can it be, asserted in the instant case that Richardson was on Ports' property or that he was using its chattel at the time of the collision. Rather, the collision happened on a public road, while Mr. Richardson was driving his own vehicle. Further, as the trial court aptly noted, "[Petitioners] have not introduced any facts to show that P&O Ports had the authority to control Mr. Richardson's driving to and from work."[15] *See*

---

15. In order to evade this natural conclusion based on the Restatement (Second) of Torts, Petitioners urge us to adopt the proposed Restatement (Third) of Torts § 41 which they contend is more in their favor. According to the Restatement (Third):

> (b) Special relationships giving rise to the duty provided in [§ 41](a) include:
>
> . . .
>
> (3) an employer with employees when the employment facilitates the employee's causing harm to third parties.

Restatement (Third) of Torts: Liability for Physical Harm § 41(b)(3) (Proposed Final Draft No. 1, 2005). Relying on this section, Petitioners contend that a special relationship existed between Ports and Richardson because "the unreasonably long schedule endured by Richardson at the directive of P&O [Ports] caused Richardson's extreme fatigue, [and] his fatigue not only facilitated the harm to Petitioner—it was the immediate cause of the accident."

*Lamb,* 303 Md. at 242, 492 A.2d at 1300 (1985) ("[A]bsent a special relation between the actor and the third person, the actor has no duty to control the conduct of a third person and therefore no liability attaches for the failure to control that person." (footnote omitted)); *Pilgrim v. Fortune Drilling Co.,* 653 F.2d 982, 985–86 (5th Cir.1981) (holding that, under Texas law, an employer was not liable for injuries caused by an exhausted employee in commuting home, because the circumstances did not demonstrate the requisite relationship under Restatement (Second) of Torts § 317).

Petitioners' argument was rejected by the intermediate appellate court in *Kuykendall v. Top Notch Laminates, Inc.,* 70 Md.App. 244, 520 A.2d 1115 (1987), considering the analogous situation of an employee incapacitated by alcohol at a work-related function. *Kuykendall* relied in large part on our decision in *Felder v. Butler,* 292 Md. 174, 438 A.2d 494 (1981), which held that, absent a dram shop statute, injured third parties have no cause of action against a vendor of alcoholic beverages for the negligence of an intoxicated patron. *Felder,*

---

We agree with Respondent, that, even if we were to entertain adopting the language of the yet unpublished Restatement (Third), it would not change the conclusion in this case, because the section merely reiterates the requirements of the Restatement (Second) in a more succinct form. This is evidenced by proposed comment e, which states:

Employment facilitates harm to others when the employment provides the employee access to physical locations, such as the place of employment, or to instrumentalities, such as a police officer carrying a concealed weapon while off duty, or other means by which to cause harm that would otherwise not be available to the employee.

*Id.* at § 41 cmt. e.

As this comment demonstrates, Restatement (Third) merely rephrases the same limitations explained in Restatement (Second), by stating that "employment facilitates harm" to third parties where an employee has access to the property or instrumentalities of the employer. Thus, regardless of the Restatement relied upon, it is clear that for an employer to have a special relationship with an employee and thereby a duty to protect third parties for acts outside the scope of employment, there must be "a real means of control over the employee which, if exercised, would meaningfully reduce the risk of harm." *Grand Aerie Fraternal Order of Eagles v. Carneyhan,* 169 S.W.3d 840, 852 (Ky.2005) (citation omitted). Neither the Restatement (Second) nor the Restatement (Third) support the theory that on-the-job fatigue is a hazard facilitated by the employment sufficient to create a special relationship.

292 Md. at 183–84, 438 A.2d at 499–500. In *Kuykendall*, two employees of Top Notch Laminates, Inc., were driving in separate cars while intoxicated, engaging in "horse play" on the road, when one crossed the center line, colliding with and killing a third party. *Kuykendall*, 70 Md.App. at 246, 520 A.2d at 1115. For approximately five-and-a-half hours prior to the collision, the employees were consuming alcohol at a company Christmas party. *Id.* The complaint averred that Top Notch knew that the employees were intoxicated, but continued to serve them alcoholic beverages, and then permitted them to drive their automobiles away from the party. *Id.* Even so, the trial court granted the motion to dismiss filed by the employer. *Kuykendall*, 70 Md.App. at 246–47, 520 A.2d at 1116. The intermediate appellate court affirmed, and made clear that Top Notch could not be held primarily negligent for the accident because it did not have a "special relationship" with either the victim or its employees sufficient to create a legal duty to protect a third party. The Court stated:

> The Court of Appeals has adopted the principle that there is no liability to a third person absent a "special relationship" with a clear right to control. *Ashburn v. Anne Arundel County*, 306 Md. 617, 510 A.2d 1078 (1986); *Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985). There is nothing in the matter *sub judice* to suggest that Top Notch had a right to control [the employee's] actions after business hours.

*Kuykendall*, 70 Md.App. at 249, 520 A.2d at 1117.

Petitioners marginalize the applicability of *Kuykendall*, and attempt to bolster their argument by citing to two out-of-state cases in which the courts determined that employers owed a duty to third parties injured by fatigued employees commuting home from work. In *Robertson v. LeMaster*, 171 W.Va. 607, 301 S.E.2d 563 (1983) the Supreme Court of Appeals of West Virginia reversed a trial court's determination that an employer owed no duty to the general public when its employee caused a traffic accident while commuting home after working for 27 hours. The case, however, is factually distinguishable from the instant case. In *Robertson*, the employer

had knowledge of the employee's fatigue because the employee notified the employer several times that he (the employee) was tired and wanted permission to go home. Further, the employer provided transportation for the employee to his vehicle following his shift, and while en route, "the obviously exhausted [employee] fell asleep with a [lit] cigarette in his hand in the presence of ... [co-]employees." *Robertson*, 301 S.E.2d at 568; *see Berga v. Archway Kitchen & Bath, Inc.*, 926 S.W.2d 476, 482 (Mo.Ct.App.1996) ("In finding a duty, the [Robertson] court focused on the affirmative acts of requiring the worker to continue, despite the workers' verbal indications of his [fatigue], and driving the employee to his vehicle, despite obvious indications of his [fatigue]....").

The case is also legally distinct because the West Virginia Court identified the issue as being whether "[the employer's] conduct in requiring its employee to work such long hours and then setting him loose upon the highway in an obviously exhausted condition [created] a foreseeable risk of harm to others which the [employer] had a duty to guard against." *Robertson*, 301 S.E.2d at 569. The court's answer to this question, to the extent that it suggested that an employer could be liable for scheduling the employee to work unreasonably long hours, belies the court's predilection to expand liability in order to largely equate a legal duty with "an original moral duty." *See Robertson*, 301 S.E.2d at 567. While the West Virginia court cited the Restatement (Second) of Torts § 317, and recognized the traditional principle "that an employer is normally under no duty to control the conduct of an employee acting outside the scope of his employment," it did not analyze the presence of a special relationship under the facts. *Robertson*, 301 S.E.2d at 567. Rather, the court stated that the central consideration was "whether the [employer's] conduct prior to the accident created a foreseeable risk of harm." *Id.* As emphasized, *supra*, however, we have repeatedly stated that " 'foreseeability' must not be confused with 'duty.' The fact that a result may be foreseeable does not itself impose a duty in negligence terms." *Ashburn*, 306 Md. at 628, 510 A.2d at 1083; *accord Pendleton*, 398 Md. at

462, 921 A.2d at 205 ("While foreseeability is often considered among the most important of [the] factors, its existence alone does not suffice to establish a duty under Maryland law." (quotation omitted)). Also, Maryland courts, by contrast, have specifically rejected the concept of expanding liability to the bounds of what might be considered a "moral duty." *Jacques v. First Nat'l Bank,* 307 Md. 527, 534, 515 A.2d 756, 759 (1986) ("A tort duty does not always coexist with a moral duty." (citation omitted)).

Petitioners next cite to *Faverty v. McDonald's Restaurants of Oregon, Inc.,* 133 Or.App. 514, 892 P.2d 703 (1995). In that case, Oregon's intermediate appellate court affirmed the trial court's determination that an employer could be liable when its teenaged employee injured a third party while commuting home after working three-shifts within a 24–hour period. The employer asserted that, pursuant to Restatement (Second) of Torts § 315, it had no duty to control the acts of its employee in the absence of a special relationship. There was no special relationship under § 317, the employer argued, because the accident did not occur on the employer's property, nor did it involve the employer's chattel. *Faverty,* 892 P.2d at 707–08. The Court rejected this argument, noting that even assuming, *arguendo,* that there was no special relationship under § 317, the employer would not be able to invoke the general rule under § 315. Instead, according to Oregon case law, including its recognition of dram shop liability, the employer would still be "subject to the general duty to avoid conduct that unreasonably creates foreseeable risk of harm" to a third party. *See Faverty,* 892 P.2d at 708, 710. As explained, *supra,* this is not the law in Maryland.[16] *See Ashburn,* 306

---

**16.** We note that while we agree with its disposition of the case, the intermediate appellate court erred in giving any weight, persuasive or otherwise, to *Faverty,* because it is inconsistent with Maryland case law. The intermediate appellate court, in the case at bar, stated that its opinion did not "hold that an employer has no duty to protect the public from risks that its employees pose, other than that imposed by *respondeat superior." Barclay,* 198 Md.App. at 587, 18 A.3d at 942. Instead of discussing the concept of "special relationship," however, the court went on to contrast the facts with those presented in *Faverty,*

Md. at 628, 510 A.2d at 1083 ("[T]here is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured." (citations omitted)); *Lamb*, 303 Md. at 242 n. 4, 492 A.2d at 1300 n. 4 ("In the absence of either one of the kinds of special relations described in [§ 315], the actor is not subject to liability if he fails, either intentionally or through inadvertence, to exercise his ability so to control the actions of third persons as to protect another from even the most serious harm." (quotation omitted)); *Kuykendall*, 70 Md.App. 244, 520 A.2d 1115 (holding that employers have no liability to members of the general driving public for injuries caused by intoxicated employees acting outside the scope of their employment).

As Respondent points out, the *Faverty* case has been widely criticized and labeled by at least one court as a decision which "stands alone as an aberration in negligence law." [17] *Behrens*

---

noting that, in that case, "the employer violated its stated scheduling policy and had an eighteen-year-old employee work twelve-and-a-half out of seventeen consecutive hours." *Barclay*, 198 Md.App. at 588, 18 A.3d at 942. The court continued:

> The point we wish to make is that the employers in these cases unexpectedly caused their employees to endanger others, thereby placing the employee in a position where he or she could not reasonably mitigate the attendant risks. As such, injury to third parties was a natural and probable consequence of the employers' actions.

*Barclay*, 198 Md.App. at 588, 18 A.3d at 943.

By contrast, the intermediate appellate court noted that, due to his frequent long shifts, Mr. Richardson was charged "with the knowledge that his employment posed a risk to third parties, and the law required him to mitigate that harm, lest he be liable for breaching his duty of general care." *Barclay*, 198 Md.App. at 588, 18 A.3d at 943. We fail to understand how a person's level of fatigue after work is any more or less perceptible according to the amount of prior notice he or she receives as to shift length. Similarly, we fail to see the connection between this section of the intermediate appellate court's opinion and the presence or absence of a duty on behalf of the employer to the injured third party. Therefore, we disavow this analysis and apply our explanation of the applicable law, *supra*.

**17.** As described by one author:

*v. Harrah's Illinois Corp.*, 366 Ill.App.3d 1154, 304 Ill.Dec. 303, 852 N.E.2d 553, 558 (2006). Indeed, we find the dissent in *Faverty* to be more in accord with the tenor of Maryland case law. The dissent deemed the holding to be unprecedented in that "[i]t ma[de] all employers potentially liable for their employees' off-premises negligence when an employee becomes tired as a result of working." *Faverty*, 892 P.2d at 714 (Edmonds, J., dissenting). The dissent continued:

> [The employee] was not on defendant's business premises and was on his own time when he drove home from work that morning. [The employee] was not acting on defendant's behalf, nor did defendant have actual control of or the right to control [the employee's] driving conduct or where he went after he got off work. Moreover, no omission or affirmative act by defendant prevented [the employee] from choosing to have someone pick him up after work, or to take a nap in his car before driving home, or some other preventive measure. The accident occurred about 20 minutes after [the employee] left work, at a location miles from where defendant conducted business. There is no evidence that plaintiff's presence on the road had any connection with the

---

The major shortcoming in *Faverty* is, as the dissent aptly points out, the failure to say when the duty of the employer arises and to what extent it runs. The allegation is simply that the "defendant was negligent in working [the employee] more hours than was reasonable under the circumstances." The court posits a general duty to avoid conduct that unreasonably creates a foreseeable risk of harm to a plaintiff, but does not say if the duty in *Faverty* arises at the point of scheduling the employee to work the extra shift, at the point of dismissing the employee after having worked the shift, or at some point in between. Moreover, the court provides no indication of what the duty entails. For example, one could ask whether there was a duty to inquire into [the employee's] success in balancing his school responsibilities with his job responsibilities in order to determine if he was getting enough sleep. The *Faverty* court's failure to adequately define the nature and scope of the duty imposed on the employer left the opinion open to the criticism that it was merely "a value judgment about when and to whom employers should be responsible for their employees' off-work negligence."

Gene P. Bowen, Note, Wherein Lies the Duty? Determining Employer Liability for the Actions of Fatigued Employees Commuting From Work, 42 Wayne L.Rev. 2091, 2102–03 (1996) (footnotes omitted).

business of the restaurant. Fate would have it that he was one of many motorists traveling the highway that morning, and it was his vehicle that was in the way when [the employee] fell asleep and his car crossed over the center line.

*Faverty,* 892 P.2d at 715 (Edmonds, J., dissenting).

Several other cases have shared the *Faverty* dissent's view that an employee's on-the-job fatigue does not change the fact that "there is no traditional concept of negligence liability which imposes the responsibility on an employer to prevent an employee from operating his own car once the employee's work shift is completed." *Faverty,* 892 P.2d at 715–16 (Edmonds, J., dissenting); *see e.g., Pilgrim v. Fortune Drilling Co., Inc.,* 653 F.2d 982, 985–86 (5th Cir.1981) (holding that, under Texas law, an employer had no duty to prevent employees from driving home "when they are so exhausted from working that their driving would create an unreasonable risk of harm to others," because the employer did not, and could not control the employee "once he had finished his day's work"); *Behrens v. Harrah's Ill. Corp.,* 366 Ill.App.3d 1154, 304 Ill.Dec. 303, 852 N.E.2d 553, 556 (2006) ("An employer should be able to presume that the person in the best position to avoid driving while excessively fatigued, the employee, will either ask for a ride from someone or pull off the roadway and rest if necessary."); *Brewster v. Rush–Presbyterian–St. Luke's Medical Ctr.,* 361 Ill.App.3d 32, 296 Ill.Dec. 884, 836 N.E.2d 635 (2005) (holding that a hospital owed no duty to a plaintiff injured in a car collision by an off-duty resident doctor, exhausted after her 36–hour shift at the hospital, in the absence of a special relationship); *Baggett v. Brumfield,* 758 So.2d 332, 338 (La.Ct.App.2000) ("[The employer] did not require that [the employee] work for such an extended period of time, and it had no control over his acts once he exited the plant. To find [the employer] liable ... would result in diluting the principle of individual responsibility to which we adhere in this court and in our state."); *Black v. William Insulation Co.,* 141 P.3d 123 (Wyo.2006) (holding that employ-

er had no duty to a third party killed by an exhausted employee who fell asleep at the wheel).

Thus, from the cases that have considered factual scenarios similar to that presented in the instant case, the clear weight of authority has rejected employer liability for third party injuries caused by an exhausted employee commuting home. We find *Nabors Drilling, U.S.A. Inc. v. Escoto*, 288 S.W.3d 401 (Tex.2009), to be particularly persuasive. In that case, the Supreme Court of Texas held that an employer was not liable for a third party's injury when a fatigued employee caused an accident during the commute home from work. The court explained, and we agree, that "[c]onsidering the large number of [citizens] who do shift work and work long hours (including doctors, nurses, lawyers, police officers, and others), there is little social or economic utility in requiring every employer to somehow prevent employee fatigue or take responsibility for the actions of off-duty, fatigued employees." *Nabors*, 288 S.W.3d at 410–11. It continued:

Even if we assume that injury to third persons from employee fatigue is sufficiently foreseeable, foreseeability alone is not sufficient to create a new duty. *See, e.g., Love*, 92 S.W.3d at 456 ("We have declined to hold an alcohol provider liable for [drunk driving] injuries in some cases, not because the harm was unforeseeable, but because the defendant had no duty."). A duty to protect the public from fatigued employees would impose a substantial burden on employers, which we do not believe can be reasonably justified. Employers would have to inspect employees for signs of fatigue impairment, but ... no quantitative measure or criteria are available to determine an employee's level of fatigue or assess whether an employee is merely tired or is actually incapacitated. In addition, employers would be compelled to take steps to eliminate fatigue at work, a very difficult task when no certain amount or type of work is known to consistently cause fatigue impairment in all persons, and when an employee's off-duty conduct will affect his level of fatigue.... [O]ff-duty factors such as an employee's commute length, lifestyle, sleep cycle during

weeks off, sleep disorders, and medications can affect worker fatigue. Expecting employers to monitor or control such factors would be unreasonable, especially when the risk of driving while fatigued is within the common knowledge of all drivers, and employees generally know not to drive when they are too tired. A duty that could, in effect, impose liability on employers for allowing employees to leave the work site if they exhibit any signs of possible fatigue would be far-reaching and onerous.

*Nabors*, 288 S.W.3d at 411–12 (some internal citations omitted); *see also Behrens*, 304 Ill.Dec. 303, 852 N.E.2d at 556–57 ("[I]ndividual employees are in the best position to determine whether they are sufficiently rested to drive home safely ... [P]lacing this burden on employers would be poor social policy that is likely to have an onerous impact, not only on employers, but also on the workforce."). The court indicated that even if the employer had the requisite knowledge of the employee's impairment, this alone would not be dispositive. Rather, the court said that, "simply knowing that an employee is intoxicated or incapacitated is not enough for a duty to arise. Rather, the employer must *affirmatively* exercise control over the incapacitated employee." *Nabors*, 288 S.W.3d at 407 (quotation omitted). Under the facts,

> [The employer] did not exercise any post-incapacity control over its employee. [The employee] completed his shift without incident and was not sent home early because of any impairment. Nabors did not instruct [the employee] to drive home or escort him to his car. *Cf. Robertson v. LeMaster*, 171 W.Va. 607, 301 S.E.2d 563, 567–68 (1983). The only control that Nabors exercised was in establishing work conditions and setting the shift work schedule, and th[i]s occurred before any incapacity on [the employee's] part. But [Texas precedent] requires an affirmative act of control following, and prompted by, the employee's incapacity.

*Nabors*, 288 S.W.3d at 407 (citations omitted). We consider this logic to be a reasonable application, in the instant case, of our holdings in *Felder v. Butler*, 292 Md. 174, 438 A.2d 494

(1981), and *State v. Hatfield*, 197 Md. 249, 78 A.2d 754 (1951), and the intermediate appellate court's decision in *Kuykendall v. Top Notch Laminates, Inc.*, 70 Md.App. 244, 520 A.2d 1115 (1987). Indeed, in reaching its conclusion, the *Nabors* Court had to distinguish its earlier case of *Otis Engineering Corp. v. Clark*, 668 S.W.2d 307 (Tex.1983), which had determined that an employer could be held primarily negligent when it had knowledge that its employee was intoxicated but nevertheless affirmatively escorted him to his vehicle and allowed him to drive away. *Nabors*, 288 S.W.3d at 405–06 ("In the present case, [unlike in *Otis*], [the employer] did not have the requisite knowledge of employee impairment, nor did it exercise the requisite control."). The intermediate appellate court in *Kuykendall* also distinguished the facts of *Otis* from the facts presented, stating that "Top Notch, took no affirmative act with respect to [the employee] operating a motor vehicle." *Kuykendall*, 70 Md.App. at 251, 520 A.2d at 1118; *see also Hatfield*, 197 Md. at 252, 78 A.2d at 755 (suggesting, by examining an out-of-state case, that a tavern owner may be liable to an injured third party if, for example, he or she placed a drunken patron into a vehicle and forced him to operate it). Thus, we conclude, in light of Maryland precedent, as augmented by persuasive authority, that an affirmative act of control by the employer *following* and prompted by the employee's incapacity must be present in order for a duty to arise, and we decline "to create a duty where an employer's only affirmative act of control *preceded* the employee's shift and incapacity and amounted only to establishing work conditions that may have caused or contributed to the accident." *Nabors*, 288 S.W.3d at 407.

It is clear, in the instant case, that Ports did no more than merely establish the shift work schedule for the unloading of the Saudi Tabuk, and did nothing to affirmatively control whether Richardson drove home in a fatigued state. We adhere to the principles inherent in common-law negligence actions, and decline to find a duty on behalf of an employer to a third party, injured by a commuting employee, based solely on the fact that an employee's fatigue was a

foreseeable consequence of the employment. Insofar as Petitioners are maintaining that we should abandon long-standing principles, and use this case to fashion some type of judicially-imposed maximum working hours standard across all industries, we unequivocally decline to do so. *Felder*, 292 Md. at 183, 438 A.2d at 499 ("[T]he Court has always recognized that declaration of public policy is normally the function of the legislative branch of government." (citation omitted)); *Grady v. Unsatisfied Claim & Judgment Fund Bd.*, 259 Md. 501, 505, 270 A.2d 482, 484 (1970) ("The question of [creating] social policy ... is peculiarly appropriate for legislative, not judicial, determination." (quotation omitted)).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS.**